KALVAR CORPORATION, Plaintiff,

v.

XIDEX CORPORATION, Defendant.

No. 70–1860–CBR.

United States District Court,
N. D. California.

Nov. 9, 1973.

Cushman, Darby & Cushman, Lawrence A. Hymo, William T. Bullinger, Washington, D. C., Bronson, Bronson & McKinnon, E. D. Bronson, Jr., San Francisco, Cal., Calvin J. Laiche, New Orleans, La., for plaintiff.

Townsend & Townsend, Albert J. Hillman, Charles E. Townsend, Jr., Marvin W. Murray, Brobeck, Phleger & Harrison, John W. Larson, San Francisco, Cal., Milling, Saal, Benson, Woodward & Hillyer, Neal D. Hobson, New Orleans, La., for defendant.

## OPINION AND ORDER DISMISSING ACTION

RENFREW, District Judge.

On September 1, 1970, Kalvar Corporation ("Kalvar") brought this action against Xidex Corporation ("Xidex") in a two-count complaint alleging patent infringement and unfair competition. The jurisdiction of the Court was invoked pursuant to 28 U.S.C. § 1338(a) and 35 U.S.C. § 281. Defendant's First Amended Answer and Counterclaims, filed on July 21, 1972, included a counterclaim charging a violation of the antitrust laws and a counterclaim for declaratory relief with respect to the validity, infringement, and enforceability of United States Patent No. 3,149,971. Specifically, defendant claimed that the patent in question was invalid because the invention covered by it was in public use or on sale, within the meaning of 35 U.S.C. § 102(b), more than one year prior to the filing date of the original patent application on which the patent was granted.

Accordingly, by agreement of the Court and the parties a separate trial on the limited issue of the validity of United States Letters Patent 3,149,971 under 35 U.S.C. § 102(b) was held pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, commencing on December 11, 1972. The trial was held from that date through December 19, 1972. Then, after submission of post-trial briefs by counsel, final argument was heard on April 27 and 28, 1973. Counsel for Kalvar asked the Court to delay rendering its opinion in the hope that the case could be settled. At a settlement conference held on August 2, 1973, Kalvar counsel advised the Court that settlement appeared unlikely. At the Court's suggestion, the parties agreed to make one last effort to see if the matter was capable of settlement. By letters dated August 8, 1973, the parties each advised the Court that settlement was not possible.

This opinion constitutes this Court's Findings of Fact and Conclusions of

Law on the issue of patent invalidity pursuant to Rule 52(a) of the Federal Rules.

Kalvar Corporation, a Louisiana corporation, was organized in 1956 as a successor to T. J. Moran's Sons, Inc., to develop and promote vesicular photography, a process by which a photographic image is produced in the form of vesicles, or very small bubbles, in a plastic vehicle by exposing the photographic material to light and then heating it. The patent itself pertains to a manufacturing process in which vesicular photographic material is treated with a hot aqueous fluid by a process known as "thermal cycling" so as to improve its photographic characteristics, particularly the film's ability to yield continuous-ton reproductions.

Kalvar, upon its formation, actively experimented with new kinds of vesicular photographic materials, heat treatments, and manufacturing techniques. In 1956, it produced a variety of vesicular photographic materials, some of which were subjected to the thermal cycling process and some of which were not. The patent in question, United States Letters Patent No. 3,149,971 for "Method of Improving Gradation of Light Scattering Photographic Material," was granted to Kalvar on September 22, 1964, based upon a patent application filed in the Patent Office on October 14, 1958.

For purposes of this separate trial, defendant Xidex prays for a decree that United States Letters Patent No. 3,149,971 is invalid by reason of prior public use or sale under 35 U.S.C. § 102(b).[1] Therefore, the critical date for purposes of making that determination is October 14, 1957, one year prior to the filing of the application which was to result in the issuance of the patent.

Since 1956 Kalvar activities can be viewed as falling into two basic categories—research and development in vesicular photographic materials and applications and the sale of vesicular photographic materials. While the relative degree of involvement in the respective activities was the subject of some dispute at trial, there was no question but that there were sales of film. Of the vesicular photographic materials produced by Kalvar, however, some materials were subjected to the patented process and some were not. For purposes of this inquiry, it becomes necessary to determine whether or not sales were made of vesicular materials which had been subjected to the patented process.

The experimental program conducted by Kalvar involved determining the effect on the vesicular photographic material of using plastics, individually and in mixture with each other, the effect of various sensitizers, and an evaluation of the effect of manufacturing conditions on photographic characteristics. Experimentation also involved different kinds of heat treatments to drive off solvents. The sales program of Kalvar, on the other hand, included, it is claimed by defendant, a major Government procurement contract for vesicular photographic materials as well as sales to private customers. In addition, defendant alleges extensive promotional activities on behalf of Kalvar for the purpose of generating sales of film which had been subjected to the patented process.

Much of the initial inquiry at trial was directed at determining whether, in fact, Kalvar's production activities and capabilities were such as to allow them to produce thermally cycled vesicular photographic materials in amounts sufficient in quantity and quality to offer

---

[1]. 35 U.S.C. § 102(b) in relevant part provides:

"A person shall be entitled to a patent unless—

 \* \* \* \* \*

"(b) The invention was patented or described in a printed publication in this or a foreign country or in the public use or on sale in this country, more than one year prior to the date of the application for patent in the United States \* \* \*."

film subject to the patented process into commercial sale or use.

It is clear that prior to June 1, 1957, Kalvar had developed a crude apparatus to thermal cycle vesicular materials in roll form. In May of 1957 Kalvar's first attempt to carry out thermal cycling on a large scale was initiated in connection with a Naval Research and Development contract to develop a vesicular photographic paper for duplicating aerial reconnaissance photographs. Contrary to Kalvar's assertions, it is clear that Kalvar attempted to meet this contract using a thermally cycled vesicular product. As evidenced by the language of a May 1957 progress report (Defendant's Exhibit 65, pp. 5–6), although "the apparatus for thermal-cycling was a crude experimental set up * * * a new apparatus had been designed" which was expected to be completed by July 1, 1957.

This apparatus was not in fact completed until sometime between August 2 and August 16, 1957, as evidenced by the several purchase orders made in the course of modifying the apparatus after its installation at the Kalvar facilities on August 2 (Plaintiff's Exhibit 199). While the precise manner in which this machine operated need not concern the Court, suffice it to say that the modified rollers were installed prior to the critical date and that between those two dates, a number of rolls of marketable vesicular photographic paper and film were produced by the thermal-cycling apparatus. Therefore, although Kalvar could not undertake rapid production for purposes of meeting large orders, Kalvar's equipment was capable of and did produce marketable film subject to the patented process.

■ The evidence conclusively establishes that, prior to the critical date, thermally cycled vesicular photographic film was sold and samples distributed to numerous individuals and organizations. Under the law, it appears that either of these activities is sufficient to invalidate the patent. The actual sale of the product made by the patented process invalidates the patent under 35 U.S.C. § 102(b). The courts have long held this to be so even if there was but one unrestricted sale. See Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 257, 8 S. Ct. 122, 31 L.Ed. 141 (1887); Tool Research and Engineering Corp., v. Honcor Corp., 367 F.2d 449, 453 (9 Cir. 1966). In addition, courts have held that the quotation of prices and attempts to sell the product require invalidating the patent as having had the patented process "on sale." In other words, actual sales need not be present to establish that the product was "on sale." Chromalloy American Corp. v. Alloy Surfaces Co., 339 F.Supp. 859, 869 (D.Del.1972). The policy considerations underlying this rule are clear and have been enunciated by the courts of this circuit many times. See Pickering v. Holman, 459 F.2d 403, 406 (9 Cir. 1972); Super Mold Corporation v. Clapp's Equipment Division, Inc., 397 F.2d 932, 933 (9 Cir. 1968). In Cataphote Corporation v. De Soto Chemical Coatings, Inc., 356 F.2d 24 (9 Cir. 1966), cert. denied, 385 U.S. 832, 87 S. Ct. 71, 17 L.Ed.2d 67 (1966), the court set out that policy:

"The express purpose of this statutory provision was to prevent the extension of the monopoly period permitted by the patent laws by requiring an inventor to make timely application so that the patent period might commence to run without undue delay." 356 F.2d at 25.

In contending that the patented process was in public use or on sale, defendant alleges a series of commercial activities or transactions, prior to the critical date, involving vesicular photographic paper and film, both of which had been subjected to the patented process. The transactions relied on include alleged distribution of samples, offers to sell, demonstrations and three completed sales of the film and paper, all prior to the critical date. For purposes of further discussion, the Court will divide its inquiry into an examination of Kalvar's distribution of samples and promotional

activities and then its alleged actual sales of film.

 In making these findings, this Court is mindful of the law that the burden of proof on the issue of prior public use rests heavily upon the party seeking to show such use. International Carbonic Eng. Co. v. Natural Carb. Prod., 57 F.Supp. 248 (S.D.Cal.1944), aff'd, 158 F.2d 285 (9 Cir. 1946); Paraffine Companies v. McEverlast, Inc., 84 F.2d 335 (9 Cir. 1936). To a large extent, this burden is imposed upon that party because pursuant to 35 U.S.C. § 282:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

Kalvar, in reliance upon Deering v. Winona Harvester Works, 155 U.S. 286, 301, 15 S.Ct. 118, 39 L.Ed. 153 (1894), and Whiteman v. Matthews, 216 F.2d 712, 716 (9 Cir. 1954), asserts that the standard closely approximates that of proof beyond a reasonable doubt. However, more recent cases in this Circuit, noting the confusion on this question in the law, explicitly rejects that standard. The court in Tucker Aluminum Products, Inc. v. Grossman, 312 F.2d 293 (9 Cir. 1963) held at 294:

"Further, it is important to observe that in this Circuit there is some confusion as to the burden of proof imposed upon a defendant who raises the defense of prior 'public use.' [citations omitted] We think the burden is successfully borne where there exists 'substantial evidence,' which is 'clear and satisfactory' although a defendant need not prove this defense 'beyond a reasonable doubt.'"

See also Amerio Contact Plate Freezers, Inc. v. Belt-Ice Corporation, 316 F.2d 459, 462, n. 7 (9 Cir. 1963). In the present case, the Court is of the opinion that the defendant has met this burden on all issues, and accordingly it finds that the patent in question must be declared invalid as having been "on sale" or "in public use" within the meaning of 35 U.S.C. § 102(b) more than one year prior to the filing of the patent application.

A. *Distribution of Samples Subjected to the Patented Process Prior to the Critical Date*

There is no dispute that it was Kalvar's practice to distribute samples of vesicular photographic materials. Often this was done in response to inquiries received with respect to such materials. Defendant's Exhibits X–5 through X–27 are a series of letters, substantially identical in form, written by Mr. Carney, who was Vice President for Sales for Kalvar, in response to inquiries about Kalvar products. Mr. Carney testified, and Xidex contends, that among the samples sent out in response to the inquiries received were vesicular photographic materials subjected to the patented thermal cycling process. Kalvar, on the other hand, contends that the letters sent by Mr. Carney do not identify the type of film being sent, and that accordingly defendant does not meet its burden of proof on the question of whether products subjected to the patented process were distributed.

The Court notes, however, that the letters also state that Kalvar paper and film were available in roll or sheet form and quoted prices for Type M and Type C film. Kalvar contends that neither of these film types were subjected to the patented process. However, the Court is of the view that some of these letters were accompanied by thermal-cycled film.[2] Moreover, Kalvar fails to account adequately for the reference in these letters to techniques developed by Kalvar by which "the grey scale range may be

---

2. See, for example, Defendant's Exhibit X–40, a Kalvar price list bearing an issue date of May 1, 1957, which was prior to the earliest date of the sample letters (Exhibits X–5 through X–27). As to two of the products listed, "Grafrekord" and "Project 19", Mr. Carney wrote on August 8, 1957, that they were "both thermal-cycled in order to assure maximum photographic speed in the 'Grafrekord' product and the widest contact possible gray scale in the 'Project 19' product * * *." (Exhibit X–41)

broadened out." Instead, they point to the fact that similar wording was used in reference to materials produced by what is called the pre-exposure technique, one of two other methods of producing continuous-tone photographic materials (Pl. Exhibit 155). Impliedly, the reference in these letters could have been to that technique. However, the testimony at trial leads the Court to inexorably to the conclusion that the thermal cycling process was the only practical way to render vesicular photographic material suitable for continuous-tone reproduction and that by virtue of the language of the letter and the Courts knowledge of the thermal cycling activities at Kalvar, the film and materials being discussed in, and accompanying those letters, had been subjected to the thermal cycling process. Both Mr. Neth, through his deposition, and Mr. Carney testified that both these techniques, mechanical stressing and pre-exposure or flashing, possessed substantial problems and were not employed at Kalvar in any of the activities in question prior to the critical date. While the Court found the testimony of Mr. Senentz and Mr. Wagner, to the effect that other ways to achieve continuous-tone copying were known in 1957, to be relevant, the fact that neither of them was employed at Kalvar prior to the critical date and thus could not give testimony as to the activities at Kalvar at that time requires that the Court weigh their testimony accordingly. On the record as a whole, therefore, this Court is of the view that samples sent out under Mr. Carney's letter were subjected to the patented process, and were neither uncycled film nor continuous tone copying materials produced by another process.

Xidex also alleges a series of promotional activities and demonstrations of materials and film subjected to the patented process. In particular, it is contended that samples were sent to potential distributors of Kalvar photographic products (Defendant's Exhibits X–30–33), to the Filmsort Division of the Dexter Folder Division of Miehle-Goss-Dexter, Incorporated (Defendant's Exhibit X–35), to Mr. Don Williamson of Williamson Development Company (Defendant's Exhibit X–38), to Mr. Gar Williams (Defendant's Exhibit X–54), to the Boeing Company in Seattle, Washington (Defendant's Exhibit X–55), to Mr. Frank Morgan (Defendant's Exhibit X–51 and X–67), to the Visual Aids Company of Washington, D. C. (Defendant's Exhibits X–76–80, 82), and to Peter Scott.

Finally, Xidex asserts that demonstrations of thermally cycled vesicular photographic materials and film were carried on before various agencies of the United States Government, including the Navy, the Minnesota Mining & Manufacturing Company (Defendant's Exhibits X–60–61), the Visual Aids Company, and various prospective investors.

The primary purpose of these distributions and demonstrations, Xidex contends, was the direct solicitation and generation of sales of thermally cycled vesicular photographic materials. They rely in part on the fact that the published Kalvar price list dated May 1, 1957, quoted prices on several products which were thermally cycled (Defendant's Exhibits X–40–41), and the fact that these price lists were widely distributed, particularly to Mr. Williamson, and in response to certain inquiry letters received. Where actual price lists were not sent, exemplary price quotations were recited (Defendant's Exhibits X–5–18, 20–27), which included quotations for thermally cycled materials. The purpose of this distribution, Xidex contends, could only have been the direct solicitation of sales.

In response to these allegations of rather extensive "public use" and offer for sale, Kalvar raises two issues: (a) the reliability and sufficiency of the evidence presented on these alleged transactions and (b) even assuming the Court were to find that the alleged transactions occurred, where the main purpose in the use of the process in question is bona fide experimentation to perfect,

test and demonstrate the utility of the invention, rather than commercial exploitation thereof, such use does not constitute prior public use or placing the invention on sale within the meaning of 35 U.S.C. § 102(b).

Kalvar claims that much of the evidence upon which Xidex relies in alleging that these transactions occurred when and as described, is based upon the recollections of individuals of events occurring over fifteen years ago. They rely upon Stearns v. Tinker & Rasor, 220 F.2d 49, 54 (9 Cir. 1955) and National Latex Products Co. v. Sun Rubber Company, 274 F.2d 224, 234 (6 Cir. 1959) to the effect that in cases such as this, where a matter of a few months is critical to the claims made, courts should give less weight to oral testimony unsupported by exhibits. However, in Anderson Company v. Trico Products Corporation, 267 F.2d 700, 701 (2 Cir. 1959), the Court specifically noted that there is no absolute requirement that there be documentary evidence of prior public use, and that oral testimony of prior public use may be sufficient to invalidate a patent.

Aside from the fact that in most instances alleged in this case, the Court was not required to rely on oral evidence alone, it must be remembered that the weighing of the testimony of witnesses and assessments of their credibility and memory are functions which lie clearly within the realm of responsibility of the trier of fact. Each case, and indeed each witness, is *sui generis* and the most the Court can expect to gain from the case law in this area is more a sense of perspective than a set of rules from which to evaluate a witness's testimony. The trier of fact must see the witness, where possible, hear his testimony, and then make a decision based on such of the evidence as he has chosen to give credence.

In this case, more importantly, much of the testimony of Mr. Carney and Mr. Daech was supplemented by documentary evidence of the transactions in question. Thus, for example in the case of samples distribution, Defendant's Exhibits X-5-2 provide documentary evidence that such distribution did occur. In the case of the demonstrations for the Minnesota Mining & Manufacturing Company, the Court was provided with a memorandum on the subject by Mr. Moran and letters (Defendants Exhibits X-60-61), while a memorandum from Dr. Neth dealt with the transactions with Visual Aids Company (Defendant's Exhibit X-78). In many instances, oral testimony was thus relied upon not to establish the timing or the nature of particular transactions, but merely to interpret particular aspects of documentary evidence that such transactions did occur, such as what was the particular type of film involved. Such testimony, unlike testimony as to dates and the like, is somewhat less subject to the corroding influences of time.

As regards Kalvar's second basic claim, that all of the activities claimed to violate 35 U.S.C. § 102(b) in fact fall within the so-called "experimentation" exception, since not only the distribution of samples and promotional activities but also such sales as the Court might find to have actually been consummated are claimed to fall within that exception, the Court will defer its discussion thereof until after making its findings of fact with respect to those sales.

Accordingly, based upon the evidence and the testimony before this Court, the Court finds that prior to the critical date, samples of thermally cycled vesicular photographic material were distributed and demonstrated to numerous individuals and business organizations, substantially as alleged by defendant Xidex. These samples and promotional activities were intended directly to generate sales of thermally cycled vesicular photographic materials. Based on the Court's decisions in Chromalloy American Corp. v. Alloy Surfaces Co., 339 F.Supp. 859, 865–869 (D.Del.1972) and in George R. Churchill Company v. American Buff Co., 365 F.2d 129, 134 (7 Cir. 1966), the mere fact of price quotations to prospective customers along

with the dissemination of samples are sufficient to support a finding that the invention was "on sale" within the meaning of 35 U.S.C. § 102(b). In addition, based on the court's decisions in Tri-Wall Containers, Inc. v. Continental Can Co., 323 F.Supp. 700, 713–714 (S. D.N.Y.1971), the Court finds that the distribution of numerous samples subject to the patented process accompanied by price quotations for the purpose of generation of sales constitutes a "public use" of the patented process.

■ On the basis of the foregoing findings, the Court would be required to find the patent in issue to be invalid under 35 U.S.C. § 102(b) unless Kalvar can demonstrate that the above activities do fall within the so-called "experimental exception." As the courts have held in George R. Churchill, Inc. v. American Buff Co., *supra*, and Cataphote Corporation v. De Soto Chemical Coatings, Inc., 235 F.Supp. 931, 938 (N. D.Cal.1964), once the evidence shows prior "public use" or placing "on sale," the burden of proof shifts to plaintiff to establish by convincing proof that the purpose of the activity was solely for the purpose of experiment. Before reaching plaintiff's assertion of that exception, the Court will set forth its findings with respect to the alleged actual sales of materials and film subject to the patented process.

### B. *Actual sales of Materials Subject to the Patented Process Prior to the Critical Date*

Xidex alleges the consummation of two sets of actual sales of thermally cycled vesicular photographic materials prior to the critical date.

First, Xidex contends that in May of 1957, Professor Peter Scott of the Massachusetts Institute of Technology, a photographic scientist and an apparently highly regarded consultant in the field of microfilm systems, purchased several rolls of uncycled vesicular microfilm from Kalvar. Relying on a memorandum from Mr. Williamson to Mr. Carney and a letter to the same effect (Defendant's Exhibits X–44 and X–46), Xidex contends that Professor Scott sought to exchange three rolls of slow film for an equal quantity of film subject to the patented process, and in addition, order two more rolls of that film. Based on Defendant's Exhibit X–45, five rolls of film, all of which the Court finds to have been subject to the patented process, despite the fact that two rolls were designated 7DTC film while three rolls were 7BT film, were shipped to Professor Scott on October 10, 1957. Kalvar claims that this transaction cannot constitute a sale of the patented product because (a) it was not proven that any film was returned for replacement, or (b) that if so, the film returned had been paid for in the first place, and (c) finally, Professor Scott was a consultant who helped Kalvar to develop its product line by carrying out experiments and reporting results, thus bringing his activities within the experimental exception to be discussed below.

■ However, the Court finds the fact that "no charge" was printed on the invoice and the word "replacement" stamped thereupon (Defendant's Exhibit X–45) to affirm Xidex's contention that since three rolls of the film were being exchanged, no further payment for those rolls was required, and such film was intended as a replacement for the film being returned.[3] Moreover, Defendant's Exhibits X–69 and X–70 (Invoice Numbers 102 and 123) completely rebut Kalvar's contention that such film had not in fact been paid for. Those invoices reveal the receipt of payment for the film on June 18 and July 23, 1957. Therefore, the Court finds that although the exchange film sent out was apparently of poor quality and again ex-

---

3. Rather than the tortured meaning Kalvar seeks to give the word, support for the Court's interpretation is found in Defend-ant's Exhibit X–57 which specifically refers to "Replacement for film to be returned" and designated "no charge."

changed in November (Defendant's Exhibit X–48), after testing showed the error, under the decision in Tucker Aluminum Products, Inc. v. Grossman 312 F. 2d 293 (9 Cir. 1963), the distribution of samples and the signing of a contract before the critical date, even though delivery may ultimately be effected thereafter, is sufficient to find that an actual sale of the patented materials or processes has occurred. As the court noted in *Tucker* at 295:

> "[I]n our view, the patented door was 'on sale' within the meaning of 35 USC § 102(b), because a contract for the furnishing of said doors was entered into prior to March 30, 1953, the critical date, and it is unimportant that the doors may not have been delivered until after March 30, 1953."

Thus, although effected by an exchange of previously purchased film, Kalvar sold to Professor Scott at least three rolls of film which had been treated by the thermal cycling process prior to the critical date. As to the additional two rolls of film allegedly ordered by Professor Scott, the Court reaches no finding since, based on the evidence before it, it is equally plausible that the film was sent along as further sample film for Professor Scott's consideration.

Second, Xidex contends that prior to the critical date, Mr. Franklin Morgan, who was Vice President and Sales Manager of Ideax Corporation, and Mr. Gar Williams of Ranier Industrial Corp. purchased film subject to the patented process for the purpose of demonstrating that film and offering it for sale to the Boeing Company. In support of its claim, Xidex relies upon letters from Kalvar to Mr. Williams (Defendant's Exhibit X–52) describing the film being purchased and its characteristics, from Morgan to Kalvar confirming shipping instructions for continuous tone film (Defendant's Exhibit X–53) and invoices from Kalvar to Ranier Industrial Corporation for that film. Moreover, Defendant's Exhibit X–51, a letter from Kalvar to Mr. Morgan, clearly indicates Kalvar's intent that thermally cycled film be used in the "Boeing application." This film was to be demonstrated and offered for sale to the Boeing Company prior to the critical date. As Defendant's Exhibit X–54, a letter to Mr. Williams from Mr. Carney, makes clear, he was encouraged by Mr. Williams' opinion that the demonstration of the product at Boeing would result in an order from them for Kalvar's inventory film, among which was, he claimed, a supply of thermally cycled continuous tone film. Defendant's Exhibits X–58 and X–59 reveal that Ranier Industrial Corporation and Ideax Corporation were subsequently billed for this film and paid for it.

Kalvar argues first that although continuous tone film was undoubtedly involved in the transactions in question, it is equally possible that the film was produced by one of the other two methods of producing such film, pre-exposure of mechanical stressing. As the Court has already found, however, based on the testimony and evidence of Kalvar's activities, the only practical method of producing continuous tone film and indeed the only method widely used at Kalvar was by the thermal cycling technique, the patented process.

Second, Kalvar claims that Ideax and Ranier Industrial Corporation were in fact Kalvar distributors, and that under Baker-Cammack Hosiery Mills v. Davis Co., 181 F.2d 550, 558 (4 Cir. 1950) and Panaview Door and Window Co. v. Van Ness, 135 F.Supp. 253, 257–259 (S.D.Cal.1955), such shipments as were sent to them did not constitute sales under 35 U.S.C. § 102(b). However, more recent cases such as George R. Churchill Company v. American Buff Co., 365 F.2d 129 (7 Cir. 1966), indicate that while experimental activities between such parties relating to the product might be excepted from the proscriptions of 35 U.S.C. § 102(b), a sale to a distributor itself is not to be excepted. As the court noted in *Churchill* at 134:

> "The use made of the buffs by plaintiff's distributors at its solicitation smacks more of a testing of the

market for product acceptance rather than a testing of the buff in an experimental use."

Thus, the mere fact that it is a distributor to which a product is delivered or sold, does not serve to exempt the transaction from the statute, but rather requires an examination of the nature of the activities of the distributor to determine whether they are experimental or sales-directed. As the court in *Churchill* concluded at 134:

"A use involving public disclosure if not *solely* to test the quality of the invention, and for the purpose of experiment, does not avoid the bar of the statute." (emphasis in original)

Hence, Kalvar's claim must rise or fall with its broader claim that its activities are within the experimental exception.

### C. *Kalvar's Claimed Experimental Exception*

Kalvar's last, and most substantial, defense to the claims asserted against its patent by Xidex is the claim that even though the Court finds the transactions to have occurred substantially as alleged by Xidex, i. e., that the patented process was "in public use" or "on sale" under 35 U.S.C. § 102(b) because Kalvar's activities were completely experimental in nature, rather than commercial, the courts have held that such activities should not be proscribed by 35 U.S.C. § 102(b). During the last half of 1957, Kalvar claims to have been engaged in extensive efforts to perfect the invention and demonstrate its utility. Accordingly, it is claimed that Kalvar's activities fall within the experimental exception carved out in Koehring Company v. National Automatic Tool Company, 362 F.2d 100 (7 Cir. 1966), where the court held at 103 that:

"A reasonable period of experimentation wherein the inventor may perfect what he has conceived has long been acknowledged as an exception to the requirement of seasonable disclosure."

This experimental period, it is claimed, goes beyond the technical stage of reduc-

ing the invention to practice and continues during attempts to perfect the invention. General Motors Corp. v. Bendix Aviation Corp., 123 F.Supp. 506, 519–520 (N.D.Ind.1954). Such experimentation includes, Kalvar contends, experiments with both the process and with machines to carry out the process. Eastern Paper-Bag Co. v. Standard Paper-Bag Co., 30 F. 63 (D.Mass.1887).

Since here the evidence shows "public use" or "on sale" prior to the critical date, the burden of proof shifts to plaintiff to establish by convincing proof that the purpose of the activity was solely experimental and not commercial in nature. Cataphote Corporation v. De Soto Chemical Coatings, Inc., 235 F.Supp. 931, 938 (N.D.Cal. 1964). This exception is a narrow one and the experimentation must relate to the subject matter of the patent claims or it will not apply. Thus, experimentation with respect to automated production equipment, such as is alleged to have occurred in this case, cannot be said to constitute experimentation with respect to the claimed invention. Cataphote Corporation v. De Soto Chemical Coatings, Inc., *supra*; Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., 409 F.2d 99, 101 (6 Cir. 1969). Similarly, testing of the product through such people as the Navy, Mr. Williams, and Professor Scott, where the experimentation related to possible applications of the product so as to create future demand, rather than the testing of the thermal cycling process itself, does not except the activity from the strictures of 35 U.S.C. § 102(b). Tool Research and Engineering Corp. v. Honcor Corp., 367 F.2d 449 (9 Cir. 1966); Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., *supra*.

With these standards in mind, the Court turns its attention to the various activities alleged to fall within the experimental exception.

First, and most importantly, is the recent opinion of this Circuit in The Robbins Company v. Lawrence

Manufacturing Company, 482 F.2d 426 (9 Cir. 1973), which is clearly dispositive of the question. There, the court in dealing with the claimed experimental exception set down the rule that:

"A sale or an offering for sale precludes any inquiry into the experimental nature of the sale *unless* the contract of sale or the offering for sale contains an express or clearly implied condition that the sale or offering is made primarily for experimental use." 482 F.2d at 433.

It being undisputed that in none of the activities in this action, including both such sales as the Court has found to occur, and such offerings as well, was any such condition either expressly or implicitly contained, the claim of Kalvar must be rejected *in toto*. Among the factors considered by the Court to imply such experimental intent would be the fact that no workable prototype had yet been developed or a requirement of confidentiality or requests that reports on the invention should be supplied the inventor. As will be explored below, no such elements being present, and no further implied conditions having been found, the Court must reject Kalvar's claims.

The Court also feels compelled to note, however, that even under the standards applied by this Court prior to the Court of Appeals' recent decision, this Court is firmly of the view that Kalvar's claims must be rejected, because basically the motivation for its activities was primarily and avowedly commercial rather than experimental in nature. As the court in Smith & Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 81 S.Ct. 122, 31 L.Ed. 141 (1887), and the court in The Robbins Company v. Lawrence Manufacturing Company, *supra*, noted, under that test, the transactions in question must have been "substantially" for purposes of experimentation. We do not so find and accordingly must declare United States Letters Patent No. 3,149,971 to be invalid by reason of prior public use or offering for sale under 35 U.S.C. § 102(b).

Once again, the Court will divide its inquiry into the sales activities and the promotional activities of Kalvar in connection with its claimed experimental activities.

Kalvar first claims that its early production and distribution of samples was carried out in an effort to perfect its automated production thermal cycling equipment. The Court is of the view, however, that experimentation with respect to production equipment does not constitute experimentation with respect to the claimed invention. The principal authority relied upon by Kalvar is Eastern Paper Bag Co. v. Standard Paper Bag Co., 30 F. 63 (1887), in which the court held that if the machine sold or used prior to the critical date was not capable of working the process, the process invention could not be said to have been sold or in public use. This case is not compelling for two reasons. First, the continuing viability of that holding is cast into considerable doubt by the passage of some 85 years, and a substantial change in the attitude of courts towards patents generally. More importantly, in that case, both the machine and the process were under distinct and separate patents. Here, on the other hand, only the process was patented and hence attempts to perfect the unpatented machinery is distinguished from attempts to perfect the process and is irrelevant to the patent in question. See Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., 409 F.2d 99, 101 (6 Cir. 1969); Super Mold Corporation v. Clapps Equipment Division, Inc., 397 F. 2d 932, 935 (9 Cir. 1968).

Turning to the other activities of Kalvar claimed to fall within the experimental exception, the admonition of the court in Koehring Company v. National Automatic Tool Company, 362 F.2d 100 at 103–104 bears mentioning:

"A reasonable period of experimentation wherein the inventor may perfect what he has conceived has long been acknowledged as an exception to the requirement of reasonable disclo-

sure. But this exception must be recognized as such; it must be so limited as not to interfere with the effectuation of the policy underlying the general rule of early disclosure. An inventor may not be permitted to use a period of experimentation as a competitive tool. '[T]he use [of an invention] ceases to be experimental when the motivation of the inventor is to exploit the invention and gain a competitive advantage over others.' Solo Cup Co. v. Paper Mach. Corp., 240 F.Supp. 126, 131 (E.D.Wis.1965)."

Turning first to Kalvar's activities in connection with the distribution of samples and the various demonstrations involved, the evidence presented to this Court leads to the conclusion that Kalvar's activities were primarily attempts to generate demand for the product rather than to test the process invention itself. Under similar circumstances in Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., *supra*, the court found that demonstrations and distributions of samples were not experimental but promotional in nature. The Court finds several factors which all dictate a similar conclusion here. With respect to the samples distributed, the Court has already found that Kalvar quoted prices for film subject to the patented process (Defendant's Exhibits X–40 and X–41). The fact of price quotation was deemed particularly significant in Super Mold Corporation v. Clapp's Equipment Division, Inc., 397 F.2d 932, 934 (9 Cir. 1968). In addition, the letters accompanying these samples (see Defendant's Exhibits X–5 through X–27) do not evidence an effort on the part of Kalvar to obtain further data on the quality of further development of its film. While the letters do make reference to new techniques developed by Kalvar, the letters state that Kalvar paper and film were available in roll or sheet form. Case prices were quoted. Nowhere did

Kalvar give any indication that it wished the receivers of these samples to report back their findings or results with respect to the film.[4] As the court noted in Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., *supra*, in rejecting a similar claim:

> "There was also no convincing evidence to show that the results of the field tests were even reported back to 3–M and used in conjunction with its experiments." (409 F.2d at 101.)

Similarly, the various demonstrations of the processed product carried on before 3–M (Defendant's Exhibits X–60 and X–61), the Navy, the Visual Aids company (Defendant's Exhibit X–78), and others, could only have been for the purpose of soliciting sales (see Transcript, p. 72). See Chromalloy American Corp. v. Alloy Surfaces Co., 339 F.Supp. 859, 865–869 (D.Del.1972) and George R. Churchill Company v. American Buff Co., *supra*, where, as here, the court found the unrestricted distribution of free samples, if commercially tinged or designed at least in part to test the product's acceptance in the market place, not to come within the Act's protection.

Kalvar also contends that the transactions involving Frank Morgan for Ideax Corporation and Gar Williams for Ranier Industrial Corporation were experimental in nature, and in any event, were within the Kalvar "family" since both were Kalvar distributors. As noted earlier, however, the mere fact that it is a distributor to which the product is delivered does not exempt the transaction from the statute if it was sales directed rather than part of an effort to test the invention. On this record, it is clear that Kalvar's activities were directed toward a sale of the product to the Boeing Corporation through Ideax and Ranier. Under *Churchill*, proof that a distributor actually sold the film prior to the critical date is not required. Defendant's Exhibit X–51, a letter from Kalvar

---

4. Significantly, when Mr. Carney was asked at trial, "What was the purpose of distributing the samples?", he replied, "Well, the purpose of distributing samples, naturally, was to show off our product and create sales." (Reporter's Transcript, p. 39)

to Mr. Morgan, clearly indicates Kalvar's intent that thermally cycled film be used in the "Boeing application." As Defendant's Exhibit X–54, a letter to Mr. Williams from Mr. Carney for Kalvar, makes clear, Kalvar was encouraged by Mr. Williams' opinion that the demonstration of the product at Boeing would result in an order for Kalvar's inventory film, which included a supply of thermally cycled film. Accordingly, there can be no question but that the Williams/Morgan sales were not primarily experimental in nature but were for the purpose of generating sales, and that they therefore were not protected. See Cataphote Corporation v. De Soto Chemical Coatings, Inc., *supra*, 235 F.Supp. at 938.

Finally, the Court must examine the transactions involving Professor Peter Scott, which Kalvar also claims to have been directed primarily towards experimentation with the patented process. It is claimed that Professor Scott and Kalvar developed an "informal consulting arrangement" whereby Scott received samples, evaluated them, and reported the results to Kalvar. Eventually, Scott did in fact become a paid consultant for Kalvar.

While not necessarily dispositive, the Court does take note of the fact that there was no consulting contract between Scott and Kalvar until 1958, nor were any consulting fees paid. Thus, Scott was under no obligation to report the results of his testing to Kalvar, an important criterion in evaluating claimed experimental activities carried out by one other than the inventor. Minnesota Mining & Mfg. Co. v. Kent Industries, Inc., *supra*, 409 F.2d at 101; Cataphote Corporation v. De Soto Chemical Coatings, Inc., *supra*, at 235 F.Supp. at 939. It appears that Professor Scott's purpose in ordering the thermally cycled microfilm was to evaluate it for use in his microfilm duplication op-

erations at the Massachusetts Institute of Technology (Plaintiff's Exhibit K–205 at p. 5; Scott deposition at 44).

Moreover, Kalvar's interest in Professor Scott appears to have been variously motivated, in part by the fact that as a well-known photographic scientist, his endorsement of Kalvar's product could serve to generate sales to many others,[5] in part by the potential customer Professor Scott himself represented, and no doubt in part for his expert evaluation of the thermal cycled microfilm. Accordingly, the Court finds that while the transactions between Professor Scott and Kalvar were in part directed toward experimentation with the patented process, these activities were primarily directed toward the solicitation and generation of sales, and were thus "commercially tinged" so as to preclude exemption from the provisions of 35 U.S.C. § 102(b). Cataphote Corporation v. De Soto Chemical Coatings, Inc., *supra*.

 It is, then, this Court's finding that the various sales, samples distributions, demonstrations, and promotional activities found to have been engaged in by Kalvar were not undertaken with the purpose of the technical development of the process of the invention, but rather the main thrust was the stimulation of interest in, and the commercial exploitation of, the product. The experimental exception to 35 U.S.C. § 102(b) carved out by the courts in order to allow perfection of the patented process does not envision that the experimentation involved be with respect to the testing of the marketability of the product but rather with the patented process itself. Accordingly, Kalvar has failed to meet its burden of proof on the claimed experimental justification for its activities, under either the traditional test, or that recently announced by this Circuit in The Robbins Company v. Lawrence Manufacturing Company, 482 F.2d 426 (9 Cir. 1973).

5. Thus, in a letter concerning the activities of Mr. Don Williamson, a sales manager for Kalvar in the New England area, Mr. Carney stated that: "Don feels strongly that if we can get Scott sold, we will automatically sell a number of large installations." (Defendant's Exhibit X–42)

Accordingly, the Court finds that the invention covered by United States Patent No. 3,149,971 was in public use or on sale within the meaning of 35 U.S.C. § 102(b), more than one year prior to the filing date of the original patent application on which the patent was granted, and is therefore declared to be invalid.

Accordingly, it is hereby ordered, adjudged and decreed that plaintiff Kalvar Corporation's action charging patent infringement is dismissed.