**In re Jack E. CAVENEY and Roy A. Moody.**

**Appeal No. 84–1209.**

United States Court of Appeals, Federal Circuit.

May 8, 1985.

Charles F. Pigott, Jr., Pigott, Gerstman & Gilhooly, Ltd., Chicago, Ill., argued, for appellants.

Charles A. Wentzel, Tinley Park, Ill., of counsel.

John F. Pitrelli, U.S. Patent & Trademark Office, Arlington, Va., argued, for appellee.

Joseph F. Nakamura, Sol. and Jere W. Sears, Deputy Sol., U.S. Patent & Trademark Office, Arlington, Va., were on brief, for appellee.

Before MARKEY, Chief Judge, and MILLER and SMITH, Circuit Judges.

JACK R. MILLER, Circuit Judge.

This is an appeal from the decision of the United States Patent and Trademark Office ("PTO") Board of Appeals ("board") sustaining the rejection of claims 26–28, 38–41, and 45 under 35 U.S.C. § 102(b). We affirm.

## BACKGROUND

The subject application, which is assigned to the Panduit Corporation, was filed on April 7, 1969, and is drawn to a one-piece cable tie adapted to be wrapped around a bundle of wires to secure them together.[1] Subsequent to filing this application, appellants presented claims 38–41 to provoke an interference with claims 1–3 and 5 of U.S. Patent No. 3,486,201 to Walter Bourne,[2] which is assigned to Bowthorpe-Hellermann, Limited ("B–H"). An interference was declared, but subsequently suspended, pursuant to 37 C.F.R. § 1.292,[3] when Walter Bourne petitioned for a public use proceeding with respect to appellants' claimed invention.

Bourne's petition was granted on November 2, 1972. During 1973, appellants and Walter Bourne took depositions, filed these depositions and some exhibits in the PTO, submitted briefs, and appeared for a final hearing in the PTO. After the hearing, the examiner issued a decision holding that the claimed invention was "on sale" in this country before the April 7, 1968, critical date. The interference was dissolved on May 10, 1974, and *ex parte* prosecution before the examiner was resumed. On May 12, 1981, the appealed claims were finally rejected.

The basis for the rejection was that Insuloid Manufacturing Company ("Insuloid"), a British corporation wholly owned by B–H, offered to sell the claimed invention in the United States to Tyton Corporation ("Tyton") prior to the critical date. Specifically, on November 14, 1967, Insuloid sent samples of the claimed invention to Tyton for evaluation along with a catalogue and technical information. Receipt of these items was acknowledged on December 13,

1. Claim 38 is illustrative of the subject invention:

A binding clip for cables and the like comprising an elongated flexible tongue, a relatively rigid head formed integrally with one end of said tongue and having an elongated eye therein, a pawl integrally and flexibly united to said head so as to define one side of said eye, said eye being formed as a straight passage of a substantially uniform cross-section complementary to that of said tongue, a series of ratchet teeth formed on said pawl so as to project into said eye in parallel relation to its major dimension, and a row of coacting teeth formed medially of said tongue, said tongue being wider than said pawl so that plain portions thereof flanking said row of teeth abut rigid parts of said head to ensure effective interengagement of the teeth on said pawl and said tongue in a manner to resist return movement of said tongue after the free end of the latter has been drawn through said eye to tighten the clip.

2. Issued December 30, 1969, on application No. 750,301, filed August 5, 1968, on "Cable and Like Binding Clips."

3. § 1.292 Public use proceedings.

(a) When a petition for the institution of public use proceedings, supported by affidavits or declarations and the fee set forth in § 1.17(j) is filed by one having information of the pendency of an application and is found, on reference to the primary examiner, to make a prima facie showing that the invention involved in an interference or claimed in an application believed to be on file had been in public use or on sale one year before the filing of the application, or before the date alleged by an interfering party in his or her preliminary statement or the date of invention established by such party, a hearing may be had before the Commissioner to determine whether a public use proceeding should be instituted. If instituted, times may be set for taking testimony, which shall be taken as provided by §§ 1.271 to 1.286. The petitioner will be heard in the proceedings but after decision therein will not be heard further in the prosecution of the application for patent.

(b) The petition and accompanying papers should either: (1) Reflect that a copy of the same has been served upon the applicant or upon his attorney or agent of record; or (2) be filed with the Office in duplicate in the event service is not possible. The petition and accompanying papers, or a notice that such a petition has been filed, shall be entered in the application file.

1967, in a letter from Robert Hall, a market research analyst for Tyton, who indicated that Tyton was in the process of determining the quantity for an initial order. On February 9, 1968, Tyton placed an order with Insuloid setting forth prices and quantities of the desired cable ties, but the cable ties were not shipped until May 13, 1968, when Tyton deemed them acceptable.

Tyton was formed as a joint venture company to be Insuloid's exclusive seller in the United States. B–H owned 49% of Tyton, while Ideal Industries ("Ideal") owned the balance.

A majority of the board affirmed the final rejection, because Insuloid offered to sell cable ties to Tyton within the meaning of 35 U.S.C. § 102(b). Insuloid and Tyton were deemed separate entities with a relationship analogous to manufacturer and either wholesaler or retailer. The fact that appellants did not cause the statutory bar was deemed irrelevant.

The dissenting member of the board asserted that Tyton acted like the marketing group in a large corporation whose receipt of samples from another group in the corporation would not be the subject of an "on sale" bar. It was further noted that Tyton kept the claimed invention secret from the purchasing public and did not complete a pricing schedule until after the critical date.

## ANALYSIS

### 1. *Standards of Proof and Review*

In their briefs, appellants state that the PTO, having alleged that the claimed invention was "on sale," bears a heavy burden of proof, citing *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 219 USPQ 8 (Fed.Cir. 1983), and other cases involving issued patents. We are asked to bear this burden of proof in mind in considering "a number of factual issues involved in this appeal."

■ However, although patents are entitled to a presumption of validity under

35 U.S.C. § 282, and the party asserting patent invalidity under 35 U.S.C. § 102(b) must support the assertion by facts constituting clear and convincing evidence (*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359–60, 220 USPQ 763, 770 (Fed.Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) ), patent applications are not entitled to the procedural advantages of 35 U.S.C. § 282. From *In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed.Cir.1984) (en banc), it is apparent that, due to 35 U.S.C. § 282, the standard of proof required to properly reject the claims of a patent application is necessarily lower than that required to invalidate patent claims. The three standards of proof generally recognized are proof by a preponderance of the evidence, proof by clear and convincing evidence, and proof beyond a reasonable doubt. *SSIH Equipment S.A. v. U.S. International Trade Commission*, 718 F.2d 365, 380, 218 USPQ 678, 691 (Fed.Cir.1983) (Nies, J., additional views). Because it is the only standard of proof lower than clear and convincing, preponderance of the evidence is the standard that must be met by the PTO in making rejections (other than for "fraud" or "violation of the duty of disclosure" which requires clear and convincing evidence (37 C.F.R. § 1.56(d) ) [4] ).

■ In appeals from PTO rejections, the Federal Circuit does not find facts *de novo*, but, instead, reviews PTO findings under the clearly erroneous standard. *See In re Wilder*, 736 F.2d 1516, 1520, 222 USPQ 369, 372 (Fed.Cir.1984). Under this standard of review, PTO findings are overturned only if the court is left with the definite and firm conviction that a mistake has been made. *See SSIH Equipment S.A.*, 718 F.2d at 381, 218 USPQ at 692. For legal conclusions, the standard of review is correctness or error as a matter of law. *In re De Blauwe*, 736 F.2d 699, 703, 222 USPQ 191, 195 (Fed.Cir.1984).

---

**4.** A higher standard for proving inequitable conduct is warranted due to the seriousness of such alleged wrongdoing. *See SSIH Equipment S.A.*, 718 F.2d at 380–81, 218 USPQ at 691.

## 2. *"On Sale" Rejection*

■ The PTO met its initial burden of going forward by making a *prima facie* showing that the claimed invention was "on sale" in accordance with 35 U.S.C. § 102(b). *See In re Dybel,* 524 F.2d 1393, 1400, 187 USPQ 593, 598 (CCPA 1975); *In re Josserand,* 188 F.2d 486, 491, 89 USPQ 371, 376 (CCPA 1951). The shipment of samples of the claimed cable ties to Tyton on November 14, 1967, Robert Hall's acknowledgement letter of December 13, 1967, indicating that an initial order of cable ties was being prepared, and Tyton's subsequent order of February 9, 1968, setting forth prices and quantities of the desired cable ties strongly indicates that Insuloid had previously made an offer to sell ties embodying the claimed invention. An offer to sell a completed invention is sufficient to support a rejection under 35 U.S.C. § 102(b). *See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 836–37, 221 USPQ 561, 565 (Fed.Cir.1984).

Appellants argue that no offer was made, because Tyton's marketing manager, Robert Adair, signed the February 9, 1968, order, thinking he had ordered cable ties other than the claimed invention. Robert Adair actually only testified that he ordered cable ties *"similar "* (emphasis added) to an old model. However, even if we assume that the claimed cable ties were not at least "similar" to the old model, the type of cable ties Robert Adair intended to order has no bearing on whether the claimed invention was *offered* for sale. Likewise, appellants' allegations that Tyton had not decided what specific cable tie structure it would accept when it made its February 9, 1968, order and that no agreement on structure was reached until after the critical date fail to show that no offer was made.

Although the above-related activities may not be clear and convincing evidence of facts that show the claimed invention was offered for sale, we are satisfied that they establish such facts by a preponderance of the evidence. Accordingly, the board's finding of these facts was not clearly erroneous.

■ Appellants also urge us to overturn the board's finding that B–H owned 49% of Tyton during the relevant time periods, because "it appears probable that ... on February 9, 1968, [B–H] may well have acquired 100% of Tyton." In their supplemental brief before the board, however, appellants conceded that B–H owned 49% of Tyton during the period in question. Having made this concession below, appellants cannot now challenge the finding by the board on appeal.

■ Even assuming that a sale or offer to sell was made by Insuloid prior to the critical date, appellants contend that such activity, kept secret from the trade, is not a bar under 35 U.S.C. § 102(b). However, sales or offers by one person of a claimed invention will bar another party from obtaining a patent if the sale or offer to sell is made over a year before the latter's filing date. *See Pennwalt Corp. v. Akzona Inc.,* 740 F.2d 1573, 1580 n. 14, 222 USPQ 833, 837 n. 14 (Fed.Cir.1984); *General Electric Co. v. United States,* 654 F.2d 55, 61–62, 211 USPQ 867, 873 (Ct.Cl.1981).

■ An exception to this general rule exists where a patented method is kept secret and remains secret after a sale of the unpatented product of the method. Such a sale prior to the critical date is a bar if engaged in by the patentee or patent applicant, but not if engaged in by another.[5] *See W.L. Gore & Associates, Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1550, 220 USPQ 303, 310 (Fed.Cir.1983), *cert. denied,* — U.S. ——, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1147–48, 219 USPQ 13, 16 (Fed.Cir.1983). However, the activi-

---

**5.** The "on sale" provision of 35 U.S.C. § 102(b) is directed at precluding an inventor from commercializing his invention for over a year before he files his application. Sales or offers made by others and disclosing the claimed invention implicate the "public use" provision of 35 U.S.C. § 102(b).

ty in the instant case is distinguishable from that involved in *W.L. Gore* and *D.L. Auld.* Here the claimed invention was disclosed to the purchaser.

■ At oral argument, counsel for appellants asserted that an offer to sell to potential users is required before that offer can be considered non-secret and, therefore, a statutory bar. It is well established, however, that a single sale or offer to sell is enough to bar patentability. *General Electric Co.*, 654 F.2d at 60, 211 USPQ at 872; *Manufacturing Research Corp. v. Graybar Electric Corp.*, 679 F.2d 1355, 1362, 215 USPQ 29, 34 (11th Cir.1982). Having pointed out that Insuloid's offer to sell is distinguishable from that involved in *W.L. Gore* and *D.L. Auld*, the question is whether one offer to sell to a related company, like Tyton, constitutes an "on sale" bar under 35 U.S.C. § 102(b).

■ It is well settled that a sale is a contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold. 77 C.J.S. *Sales* § 1 (1952). Further, one cannot make a contract with himself. J. Calamari & J. Perillo, *Contracts* § 55 (2d ed. 1977). Accordingly, a sale or offer to sell under 35 U.S.C. § 102(b) must be between two separate entities. *Union Carbide Corp. v. Filtrol Corp.*, 170 USPQ 482, 521 (C.D.Cal.1971), *aff'd*, 179 USPQ 209 (9th Cir.1973). The mere fact that a product is delivered to a distributor does not exempt the transaction from 35 U.S.C. § 102(b). *Kalvar Corp. v. Xidex Corp.*, 384 F.Supp. 1126, 1135, 182 USPQ 532, 539 (N.D.Cal. 1973), *aff'd*, 556 F.2d 966, 195 USPQ 146 (9th Cir.1977); *see also George R. Churchill Co. v. American Buff Co.*, 365 F.2d 129, 150 USPQ 417 (7th Cir.1966). Here, although Insuloid and Tyton shared a common owner, B–H, control of these entities was clearly different; Insuloid was wholly owned by B–H, while the controlling interest in Tyton was held by Ideal. In addition, as pointed out by the Solicitor, the record shows that Tyton acted independently from Insuloid by deciding which Insuloid products it wanted and by holding up its order of cable ties until they proved to be satisfactory. If any line of demarcation was unclear, it was that between Ideal and Tyton (rather than Tyton and Insuloid), as evidenced by Tyton's use of Ideal letterhead and by Ideal officers holding similar titles in Tyton. Accordingly, we are persuaded that the PTO made a *prima facie* showing that Insuloid and Tyton were separate entities and that appellants have not rebutted it.

■ As explained by this court's predecessor in *General Electric Co.*, 654 F.2d at 61, 211 USPQ at 873, the "on sale" bar has the following underlying policies: (1) a policy against removing inventions from the public domain which the public justifiably comes to believe are freely available due to commercialization; (2) a policy favoring prompt and widespread disclosure of inventions to the public; and (3) a policy of giving the inventor a reasonable amount of time following sales activity to determine whether a patent is worthwhile.[6] As to the first policy, the public (or the "trade" as appellants call it) is not limited to potential users; separate entities, like Tyton, in the business of selling to potential users, are also members of the trade in that product. In the case of a patentee or patent applicant selling to an independently controlled distributor, all of the above policies warrant applying the "on sale" bar. When a sale disclosing the invention is made by a person other than the patentee or patent applicant, as in this case, the policy against removing inventions from the public domain and the policy favoring early filing of patent applications justify application of the "on sale" bar, as discussed in *General Electric Co.*, 654 F.2d at 62, 211 USPQ at 873.

■ Finally, appellants urge that if Insuloid made a sale or offer to sell, it did so in England, making that sale or offer to

---

**6.** These policies were earlier identified in Barrett, *New Guidelines for Applying the On Sale* *Bar to Patentability,* 24 Stan.L.Rev. 730, 732–35 (1972).

sell outside the scope of 35 U.S.C. § 102(b). Although Insuloid presumably made its offer from England, that offer was directed to Tyton at its place of business in the United States. Therefore, 35 U.S.C. § 102(b) is applicable to the facts of this case.

## SUMMARY

In view of the foregoing, we *affirm* the PTO's rejection of claims 26–28, 38–41, and 45.

AFFIRMED.