**SMITH INTERNATIONAL, INC., et al., Plaintiffs,**

v.

**KENNAMETAL, INC., Defendant.**

**No. C81–273.**

United States District Court, N.D. Ohio, E.D.

Oct. 29, 1985.

Daniel J. Sammon, Lowell L. Heinke, Watts, Hoffmann, Fisher & Heinke Co., L.P.A., Cleveland, Ohio, John Kurcz, Kane, Dalismer, Kane, Sullivan & Jurucz, New York City, for plaintiffs.

Charles R. Rust, Elaine Harmon, Woodling, Krost & Rust, Cleveland, Ohio, Albert L. Jeffers, Robert G. Irish, Gust, Irish, Jeffers & Hoffman, Fort Wayne, Ind., for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court is the defendant's motion for partial summary judgment against the plaintiffs under Fed.R.Civ.P. 56(c). Defendant argues that plaintiffs' United States Letters Patent No. 4,201,421 is invalid under 35 U.S.C. § 102(b) on grounds that "[t]here was a public use or sale in this country of the wear sleeve bit claimed in the '421 patent prior to [the date the patent application was filed]." *See* defendant's memorandum in support of their motion, p. 1. Plaintiffs oppose defendant's motion. A recitation of the factual and procedural background of this case may be found in several of the Court's many orders in this case. *See, e.g., Court's Orders of July 9 and July 25, 1985.* For the reasons which follow, the defendant's motion for partial summary judgment is denied.

## UNITED STATES LETTERS PATENT NO. 4,201,421

The patent in suit, United States Patent No. 4,201,421 (hereinafter " '421") is directed to the following design for a mining tool cutting bit:

*Fig. 1*

The cutting bit includes a carbide tipped cutter bit which is rotatably mounted to a supporting block. The supporting block is then attached to a mining machine drive wheel or chain to be used for cutting or excavating. Plaintiffs claim that the novel feature of this invention is what they term a "wear sleeve cutter bit product." The following designs illustrate the wear sleeve, which plaintiff's describe "as an elongated, split-sleeve that is mounted on and carried by a corresponding groove provided on the shank of the cutter bit."

*Fig. 2*

*Fig. 3*

Plaintiffs explain that:

The sleeve is constructed and arranged such that when the cutter bit is mounted in the bore of the mounting block, the sleeve holds the cutter bit rotatably within the block while preventing the cutter bit from being axially dislodged from the block during rotation of the machine wheel on which it may be mounted. Significantly, the sleeve is constructed and arranged such that it is held in a non-rotational relation in respect to the cutter bit and has a length sufficient so as to take-up substantially all of the wear resulting from rotational movement of the cutter bit relative to its mounting block. Accordingly, the life of mounting block being the more expensive and permanent component is increased relative to the less expensive cutter bit.

*See* Plaintiffs' memorandum in opposition to defendant's motion, p. 4–5.

### LAW AND DISCUSSION

A. *35 U.S.C. § 102(b).*

Under 35 U.S.C. § 102(b), "A person shall be entitled to a patent unless— ... (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...." As recently stated by the Federal Circuit Court of Appeals, "[t]he 'on sale' provision of 35 U.S.C. § 102(b) is directed at precluding an inventor from commercializing his invention for over a year before he files his application. Sales or offers made by others and disclosing the claimed invention implicate the 'public use' provision of 35 U.S.C. § 102(b)." *In re Caveney and Moody*, 761 F.2d 671, 675 n. 5 (Fed.Cir.1985).

In *Caveney*, the Federal Circuit Court of Appeals advanced three policies which underlie the "on sale" bar:

(1) a policy against removing inventions from the public domain which the public justifiably comes to believe are freely available due to commercialization;

(2) a policy favoring prompt and widespread disclosure of inventions to the public; and

(3) a policy of giving the inventor a reasonable amount of time following sales activity to determine whether a patent is worthwhile.

*Id.* at 676 (footnote omitted). *See also TP Laboratories v. Professional Positioners, Inc.,* 724 F.2d 965, 968 (Fed.Cir.1984), *cert. denied,* 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51. However, "[i]n contrast to these considerations, the public interest is also deemed to be served by allowing an inventor time to perfect his invention, by public testing, if desired, and prepare a patent application." *Id.* It was thusly that the exception for experimental use was born.

The Court in *TP Laboratories* set forth the test for determining whether an activity was experimental, quoting extensively from the early case of *City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 7 Otto 126, 24 L.Ed. 1000 (1877), which the Court labeled as "the starting place for analysis of any case involving experimental use." *See TP Laboratories, id.* at 970. The Court stated that the guidelines for determining experimental use were set forth with clarity in the *City of Elizabeth* case, but over the years have been obfuscated. The Court thus returned to the original test set out in the *City of Elizabeth* case, which involved a toll road built according to the invention of the patent in suit. The Court stated as follows:

That the use of the pavement in question was public in one sense cannot be disputed. But can it be said that the invention was in public use? The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a use. Curtis, Patents, sect. 381; *Shaw v. Cooper,* [32 U.S. 292] 7 Pet. 292 [8 L.Ed. 689].

Now, the nature of a street pavement is such that it cannot be experimented upon satisfactorily except on a highway, which is always public.

When the subject of invention is a machine, it may be tested and tried in a building, either with or without closed doors. In either case, such use is not a public use, within the meaning of the statute, so long as the inventor is engaged, in good faith, in testing its operation. He may see cause to alter it and improve it, or not. His experiments will reveal the fact whether any and what alterations may be necessary. If durability is one of the qualities to be attained, a long period, perhaps years, may be necessary to enable the inventor to discover whether his purpose is accomplished. And though, during all that period, he may not find that any changes are necessary, yet he may be justly said to be using his machine only by way of experiment; and no one would say that such a use, pursued with a *bona fide* intent of testing the qualities of the machine, would be a public use, within the meaning of the statute. So long as he does not voluntarily allow others to make it and use it, and so long as it is not on sale for general use, he keeps the invention under his own control, and does not lose his title to a patent.

It would not be necessary, in such a case, that the machine should be put up and used only in the inventor's own shop or premises. He may have it put up and used in the premises of another, and the use may inure to the benefit of the owner of the establishment. Still, if used under the surveillance of the inventor, and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvements as experience demonstrates to be necessary, it will still be a mere experimental use, and not a public use, within the meaning of the statute.

Whilst the supposed machine is in such experimental use, the public may be incidentally deriving a benefit from it. If it be a grist-mill, or a carding-machine, customers from the surrounding country may enjoy the use of it by having their grain made into flour, or their wool into rolls, and still it will not be in public use, within the meaning of the law.

*City of Elizabeth, id.* at 134–135, *Accord National Business Systems, Inc. v. AM International, Inc.,* 743 F.2d 1227, 1236 (7th Cir.1984), *cert. denied,* 471 U.S. 1110, 105 S.Ct. 2345, 85 L.Ed.2d 861 (1985), citing the Court's quotation in *TP Laboratories* of *City of Elizabeth* as "the proper test for determining whether an activity was experimental."

 Summary judgment is appropriate in a patent case where, as in any other type of case, no genuine issue of material fact remains for trial and the movant is entitled to judgment as a matter of law. *See, e.g., Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984); *Union Carbide Corp. v. American Can Co.,* 724 F.2d 1567, 1571 (Fed.Cir.1984). The issue for this Court is thus whether genuine issues of material fact remain for trial as to whether the patent in issue was subject to a public use or sale in this country more than one year prior to September 20, 1978, the date the application for the patent in issue was filed.

### B. *Burden of Proof.*

 Under 35 U.S.C. § 282, a patent enjoys a statutory presumption of validity. The provisions of that section place the burden of proof upon the party attacking the validity of the patent. That burden never shifts to the patent owner. Consequently, where the Court is faced with the issue of whether there has been a public use or sale under § 102(b), it is not the patent owner's burden to prove that a claimed public use or sale was experimental. Rather, the Court must determine whether, in view of all of the evidence put forth by plaintiffs and defendant, there was a public use or sale of the patent in question. *See TP Laboratories, supra.* The Court in *TP Laboratories* explained this directive, stating that:

> This does not mean, of course, that the challenger has the burden of proving that the use is not experimental. Nor does it mean that the patent owner is relieved of explanation. It means that if a *prima facie* case is made of public use,

the patent owner must be able to point to or must come forward with convincing evidence to counter that showing. *See Strong v. General Electric Co.,* 434 F.2d 1042, 1044 ... (5th Cir.1970).

*Id.* (footnote omitted). *See also Barmag Barmer, supra,* at 836. The Court continued:

> The length of the test period is merely a piece of evidence to add to the evidentiary scale. The same is true with respect to whether payment is made for the device, whether a user agreed to use secretly, whether records were kept of progress, whether persons other than the inventor conducted the asserted experiments, how many tests were conducted, how long the testing period was in relationship to tests of other similar devices. In other words, a decision on whether there has been a "public use" can only be made upon consideration of the entire surrounding circumstances.

*Id.* at 971–972.

### C. *Analysis.*

 It is undisputed by the parties that the application for the patent in question was filed on September 20, 1978. Defendant argues that wear sleeve bits which were the same as the wear sleeve bit claimed in the '421 patent were sold and shipped by common carrier more than one year prior to that date. Defendant also argues that the wear sleeve bit claimed in the '421 patent was operable, commercially viable, and commercially exploited prior to September 20, 1977.

 In support of its arguments, defendant introduces as an exhibit to its memoranda in support of its motion a copy of a production drawing which it claims was rendered for and by Universal Metal Products, Inc. (hereinafter "UMPI") to enable defendant to produce the wear sleeve claimed in the '421 patent for Mining Tools, Inc. (hereinafter "MTI"), a company which was ultimately acquired by the plaintiff Smith International, Inc. (hereinafter "Smith"). The drawing itself is not dated, although defendant claims it was rendered April 28,

1977. Defendant also appends as an exhibit copies of a quotation and invoices which are dated more than one year prior to the date of application for the patent in question. Defendant claims the quotation and these invoices were issued by suppliers of MTI to MTI for components of the wear sleeve bit claimed in the '421 patent. Defendant also appends a UMPI invoice dated June 21, 1977, for the shipment of 25 samples of wear sleeves, which it states that MTI approved. Defendant additionally appends a UMPI invoice dated June 24, 1977, issued for shipment to MTI of 4800 wear sleeves on MTI Customer Purchase Order No. 1240.

Defendant cites the Court to the deposition testimony of Carl R. Bork, formerly employed as an engineer by MTI, that MTI did not invoice bits or sleeves that were used for testing, and attaches a copy of the transcript of the deposition to his memorandum. Defendant attaches copies of MTI invoices showing that MTI's sales department provided prices, purchase order numbers, and the salesman's name for invoices for shipments of the wear sleeve bit claimed in the '421 patent by common carrier more than one year prior to the patent application date. Defendant also attaches a copy of plaintiff's stipulation that MTI paid a commission to Earl Wright, its salesman, allegedly for sales of the wear sleeve bit in question made more than one year prior to the date of the application for the patent in issue. Defendant further appends copies of what are apparently defendant's ledger sheets, for the purpose of showing that the invoices referred to by the defendant were recorded as sales more than one year prior to the date of application of the patent in question.

Defendant claims that under the August 24, 1977 licensing agreement entered into by Den Besten and O'Connell, the two men were to receive royalties on the sales price of the wear sleeve bit in issue. Defendant appends a copy of the transcript of deposition testimony of John R. Melius, Accounting Supervisor for MTI during 1977 and 1978, that Den Besten received royalty payments from MTI on sales of the wear sleeve bit in issue more than one year prior to the date that the application for the patent in issue was filed. Defendant claims that Den Besten and O'Connell filed patent application Serial Number 994,001 on September 20, 1978, claiming the wear sleeve bit that MTI had sold to its customers Vermeer Sales & Service, Inc. and R & M Construction Company prior to September 20, 1977.

As directed by law, the Court has reviewed all of the evidence put forth by plaintiffs and defendant to determine whether there has been a public use or sale of the patent in question. The Court finds that defendant's arguments and submissions in support of his motion, some, but not all of which have been discussed above, establish a *prima facie* case of public use and sale in this country more than one year in advance of the filing date of the application for patent for the invention in issue. However, the Court additionally finds that plaintiffs' arguments and submissions introduced in support thereof controvert defendant's *prima facie* case by raising genuine issues of material fact as to whether in fact there was a public use or sale of the claimed invention more than one year prior to the filing date of the application for that patent.

Specifically, the Court has reviewed the affidavits of affiants Pinkerton, Den Besten, Norder, Melius, and O'Connell, as well as additional exhibits submitted by the plaintiffs. Keeping in mind the cautionary warning issued by the Court in *TP Laboratories, supra,* at 972, that "while various objective indicia may be considered in determining whether the use is experimental, the expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value," the Court finds that the sum of the submissions on behalf of the plaintiffs raise genuine issues of material fact as to whether the wear sleeve bits produced more than one year prior to the application date were produced for testing and experimental purposes.

The submissions made by the plaintiffs indicate that the wear sleeve products manufactured prior to September 20, 1977 were prototypes of the products and were made with a flange or collar, *see* Fig. 3, *supra*, as opposed to the bit without a flange or collar depicted in Fig. 3a, *supra*. Plaintiffs' submissions indicate that the flanged or collared wear sleeve products were manufactured, produced, and invoiced for testing and experimental purposes per agreement between O'Connell and Den Besten. Plaintiffs' submissions further indicate that the two men agreed to share testing and experimental costs, and that O'Connell's company, MTI, would ship and invoice such products to Vermeer, Den Besten's company, and MTI would pay Vermeer a two percent royalty. Plaintiffs' submissions indicate that the flanged or collared wear sleeve bits were found unsatisfactory for their intended purpose, and were never commercially exploited.

Plaintiffs' submissions indicate that it was MTI's custom and practice to pay its personnel a commission on any products invoiced, whether the shipment was for experimental and testing or commercial purposes. Plaintiffs' submissions indicate that MTI's in-house salesman, Earl Wright, who was responsible for the products in question, would have automatically received a commission on the prototype wear sleeve bits even though they were to be used for testing and experimental purposes. Plaintiffs' submissions indicate that any commission received by Wright on the new wear sleeve products does not reflect on whether the invoice shipments were for experimental or commercial purposes. Rather, it simply reflects MTI's policy to provide its employees with a salary benefit.

Plaintiffs' submissions indicate that at least one invoice issued by UMPI to MTI and submitted to the Court by the defendant was for tooling to produce flanged or collared wear sleeves for experimentation. They further indicate that the UMPI invoices issued to MTI and dated June 21, 1977 and June 24, 1977 were for flanged or collared bits, to be used only for experimental purposes. Plaintiffs' submissions additionally indicate that cutter bits sent to the R & M Construction Company more than one year prior to the application date of the '421 patent were flanged or collared bits intended to be used by MTI for experimental purposes. They indicate that the bits were mistakenly sent to R & M Construction Company, and were returned by that company's successor, who never used the bits and received full credit for returning them.

The defendant's submissions attached to its reply to plaintiff's memorandum in opposition to the motion before the Court do not erase the questions of material fact raised by plaintiff's submissions.

While the Court's notes that plaintiffs have, in controverting the defendant's *prima facie* case of public use or sale, relied in large part upon the subjective attestations of the inventors, the Court nonetheless finds that at this point in the progress of this case, the totality of the evidence before the Court raises genuine issues of material fact as to the existence of a prior use or sale of the claimed invention under 35 U.S.C. § 102(b). Defendant's motion for partial summary judgment under that section is accordingly denied.

IT IS SO ORDERED.