Leo J. FREGEAU, Appellant,

v.

Gerald J. MOSSINGHOFF, Appellee.

Appeal No. 85–649.

United States Court of Appeals,
Federal Circuit.

Nov. 7, 1985.

---

Robert A. Vanderhye, Cushman, Darby & Cushman, Washington, D.C., argued for appellant.

Richard E. Schafer, Associate Sol., U.S. Patent and Trademark Office of Arlington, Virginia, argued for appellee. With him on brief were Joseph F. Nakamura, Sol., and John W. Dewhirst, Associate Sol., Washington, D.C.

Before NIES, NEWMAN and BISSELL, Circuit Judges.

NIES, Circuit Judge.

This appeal is from the judgment of the United States District Court for the District of Columbia, 602 F.Supp. 484, 224 USPQ 238 (1984), dismissing a civil action taken under 35 U.S.C. § 145 challenging the determination of the U.S. Patent and Trademark Office Board of Appeals (board) that claims 21–30 of application Serial No. 906,790 are unpatentable under 35 U.S.C. § 101 (inoperativeness—lack of utility), § 112 (inadequate disclosure of "how to use"), and § 103 (obviousness). Our jurisdiction over the appeal is found in 28 U.S.C. § 1295(a)(4)(C). We affirm.

### Background

The invention in suit relates to a method for enhancing the flavor of a beverage by passing it through a magnetic field. The application includes ten claims (numbered 21–30) covering not only changes in flavor, but also changes in the aroma, specific gravity (density), and amount of volatile chemicals in the beverage resulting from the application of a magnetic field. The flavor-enhanced beverage purportedly obtained by following the claimed method is also separately claimed in product-by-process claims. Representative claims 21 and 27 are reproduced below:

21. A method of increasing the specific gravity of a liquid selected from the group consisting essentially of ethyl alcohol containing liquids, fruit juices, coffee, tea, extruded soy protein, and chicken soup, said method consisting essentially of the steps of

establishing a magnetic field with a tubular permanent magnet with a central bore, and having opposite radially spaced first and second pole portions of opposite polarity, and a minimum strength effective to increase the specific gravity of the liquid, and

passing the liquid through the field so that the specific gravity thereof is increased.

27. A beverage selected from the group consisting essentially of ethyl alcohol containing liquids, fruit juices, coffee, tea, extruded soy protein, and chicken soup, the beverage having enhanced flavor, obtained by practicing the method steps consisting essentially of establishing a substantially constant magnetic field with a minimum strength of about 3000 Gauss, and passing the beverage through the field so that the flavor thereof is enhanced.

The examiner rejected the claims for lack of utility due to inoperativeness under § 101 and appellant admits that the invention "is one about which those of ordinary skill in the flavor chemistry art would be skeptical when first hearing of it." The claims were also rejected under § 112 as "vague, indefinite and unduly broad," and under § 103 as obvious over a handbook (King, *Pyramid Energy Handbook*, Warner Books, N.Y., 1977) an article (Davis et al., *The Magnetic Effect*, Exposition Press,

N.Y., 1977), and a French patent (No. 1,603,804, issued July 15, 1968). The product-by-process claims were rejected under § 103 as obvious over like, untreated products.

Appellant challenged the examiner's rejection on inoperativeness by submitting declarations from Robert C. Lindsay, Ph.D., Professor of Food Science at the University of Wisconsin-Madison, who had conducted taste tests and tests for detecting physical property changes of various beverages subjected to the invention. Dr. Lindsay averred that the test results demonstrated the operability of the invention. The examiner, however, remained unconvinced, stating in his final office action that, although Dr. Lindsay's credentials were not questioned, his declaration alone was insufficient to establish "evidence of the type convincing to the scientific community" and that the differences detected by his tests were insignificant.

The board agreed with the examiner that the test results failed to demonstrate operativeness of the invention, noting that while the claimed method covered "a broad class of comestible and non-comestible liquids, ... the experimental data was limited to a relatively small number of samples, particularly in the case of the physical property tests." The board also concurred with the examiner that the differences in physical properties observed were "at best minimal" and did not warrant a conclusion that they were the result of any magneto-chemical effect, rather than due to extrinsic factors, e.g., variations in ambient conditions or experimental error. With regard to the taste sensitivity tests, the board was unconvinced that the observed results were statistically significant.

The examiner's rejection under § 112 was affirmed by the board "insofar as it relates to the how-to-use requirement of the statute" on the grounds that "a specification that does not establish with certainty that the claimed invention will operate in the manner intended necessarily fails to satisfy the how-to-use requirement of the statute."

Finally, with regard to the § 103 rejection, the board agreed with the examiner that the King handbook (teaching that magnetism can be used to mellow coffee), the Davis article (disclosing the use of magnetism to treat water and milk), and the French patent (teaching that a magnetic field can be used to improve the properties of fluid foodstuffs) rendered the invention obvious. The board rejected appellant's argument that the King and Davis references related to "pseudo-sciences" and would be "completely dismissed out of hand by one of ordinary skill in the art," noting that the references were "printed publications" within the purview of the statute and that appellant's position was "in direct conflict with his position in regard to the operability of the subject invention."

At the trial before the district court under 35 U.S.C. § 145, appellant submitted an additional report prepared for the litigation by Dr. Lindsay which set forth additional data and a theory on how magnetism could act to enhance the flavor of beverages. Dr. Lindsay also testified at the trial, as did the inventor, Fregeau. In its opinion, reported at 224 USPQ 238 (1984), the district court held that, despite the additional evidence submitted by appellant, it lacked a "thorough conviction" that the board had erred, relying on the case law developed in the D.C. Circuit, e.g., *De Seversky v. Brenner*, 424 F.2d 857, 858 (1970). Accordingly, the complaint was dismissed.

### 35 U.S.C. § 145 Proceedings

This appeal involves a PTO Board of Appeals decision which comes before us, not directly under 35 U.S.C. § 141, but via the circuitous route of a civil action against the Commissioner for a patent under 35 U.S.C. § 145.[1] The thrust of such a com-

---

1. 35 U.S.C. § 145 (1982) provided:
 An applicant dissatisfied with the decision of the Board of Appeals may unless appeal

has been taken to the United States Court of Appeals for the Federal Circuit, have remedy by civil action against the Commissioner in

plaint is that the decision of the board is erroneous on the facts, the law, or both. Indeed, the board's decision is the jurisdictional base for the suit and the record before the office is the evidentiary nucleus. The proceeding, however, is not simply an appeal since the parties are entitled to submit additional evidence. Thus, an action under § 145 is conducted as a trial; however, it is in essence a suit *to set aside* the final decision of the board, like the bill in equity from which it was derived, "to set aside the conclusions reached by the administrative department." *Morgan v. Daniels,* 153 U.S. 120, 124, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1894).

The nature of the action was reaffirmed in *Hoover Company v. Coe,* 325 U.S. 79, 83, 85, 87–88, 65 S.Ct. 955, 957, 958, 959, 89 L.Ed. 1488 (1945), in the following terms:

It is evident that alternative rights of review are accorded an applicant—one by appeal to the United States Court of Customs and Patent Appeals, the other by bill in equity filed in one of the federal district courts. In the first the hearing is summary and solely on the record made in the Patent Office; in the other a formal trial is afforded on proof which may include evidence not presented in the Patent Office. [Footnote omitted.]

\* \* \* \* \* \*

Thus, a District Court might *set aside,* on bill filed, *any ruling refusing a patent....*" [Emphasis added.]

\* \* \* \* \* \*

[T]hroughout more than a century Congress has for correction of erroneous adverse rulings, which if unreversed would end the proceedings in the Patent Office, preserved the remedy by bill in a District Court either as additional to or alternative to that by summary appeal and has

the United States District Court for the District of Columbia if commenced within such time after such decision, not less than sixty days, as the Commissioner appoints. The court may adjudge that such applicant is entitled to receive a patent for his invention, as specified in any of his claims involved in the

made the effect of adjudication in equity the same as that of decision on appeal.

The *Hoover* decision contains an exhaustive analysis of the provisions in the patent statutes since 1836, together with the legislative history, respecting review by means of a bill in equity against the Commissioner. As explained therein, such an action was available originally only in connection with a decision on priority in an interference (now provided in § 146), but was later extended to a patentability decision (now provided in § 145).

In the legislative history addressing the carryover of these procedures into the 1952 Patent Act, it is stated:

This group of sections [§§ 141–146] makes no fundamental change in the various appeals and other review of Patent Office action.

1952 U.S.Code Cong. & Ad.News 2394 at 2400.

In view of the history of the sections, it cannot seriously be contended that a § 145 action is other than one to overturn the board's decision. *See Case v. CPC International, Inc.,* 730 F.2d 745, 751, 221 USPQ 196, 202 (Fed.Cir.1984); *accord Velsicol Chemical Corp. v. Monsanto Corp.,* 579 F.2d 1038, 1043, 198 USPQ 584, 589 (7th Cir.1978); *Rex Chainbelt, Inc. v. Borg-Warner Corp.,* 477 F.2d 481, 483–84, 177 USPQ 549, 551–52 (7th Cir.1973).

Despite the basic nature of the action, appellant argues that the district court abdicated its responsibility under the statute to make a *de novo* review of the evidence before it, which we understand to mean that the court must make fact findings without regard to the board's findings. The statutory language which might suggest this approach is the instruction to the district court to adjudge an applicant's entitlement to a patent "as the facts in the case may appear." However, that lan-

decision of the Board of Appeals, as the facts in the case may appear and such adjudication shall authorize the Commissioner to issue such patent on compliance with the requirements of law. All the expenses of the proceedings shall be paid by the applicant.

guage has been in the statute since prior to *Morgan v. Daniels, supra,* in which it was held that the facts found by the board "must be accepted as controlling" unless the court has a "thorough conviction" that the contrary is established. 153 U.S. at 125, 14 S.Ct. at 773. Clearly, the applicant does not start over to prosecute his application before the district court unfettered by what happened in the PTO.

 At this point, it is appropriate to note that when a board decision is before this court on a direct appeal, this court reviews the facts found by the board under the clearly erroneous standard. *In re Caveney,* 761 F.2d 671, 674, 226 USPQ 1, 3 (Fed.Cir.1985). Under the clearly erroneous standard, the reviewing court, from the entirety of the record below, must have a "definite and firm conviction" that a mistake has been made. *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Pullman-Standard v. Swint,* 456 U.S. 273, 284 n. 14, 102 S.Ct. 1781, 1788 n. 14, 72 L.Ed.2d 66 (1982); *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746, 76 USPQ 430, 443 (1948).

Thus, in either type of review proceeding the applicant has the laboring oar to establish error by the board and both types of review are within the jurisdiction of this court. Moreover, a difference in result in this court is not logically justifiable, if the evidentiary record before the district court is the same as that before the board, simply because of the review route chosen.

 While the *Morgan* standard applicable to the district court was stated in terms of a burden of proof, it was, nevertheless, a standard of review for error in the agency decision. Since we can discern no substantive difference between "thorough conviction" and "definite and firm conviction," we conclude that it will clarify review procedures for the district court, in a § 145

review, to follow the clearly erroneous standard utilized by appellate courts, and now a part of trial court jurisprudence as well.[2] The standard must be adapted, of course, to the aspect of a § 145 proceeding which allows introduction of additional evidence. However, this practice is also now a part of conventional trial court experience.[3]

Thus, even in the absence of additional evidence affecting a particular finding, a finding of fact by the board may be set aside by the district court if clearly erroneous. On the other hand, where new evidence is presented to the district court on a disputed fact question, a *de novo* finding will be necessary to take such evidence into account together with the evidence before the board.

### Lack of Utility

 Lack of utility because of inoperativeness is a question of fact. *Raytheon Co. v. Roper Corp.,* 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir.1983). Under our standard of review, the district court's finding of lack of utility here can only be set aside if it is clearly erroneous. Fed.R. Civ.P. 52(a).

The PTO, of course, bore the initial burden of showing *prima facie* that the claims sought to be patented were unpatentable. *See In re Piasecki,* 745 F.2d 1468, 1472, 223 USPQ 785, 788 (Fed.Cir.1984) (PTO has burden of making *prima facie* case under § 103.). However, in this case, appellant conceded "that a prima facie case of inoperability was originally established" simply by the nature of the invention, thereby acknowledging that he bore the burden of coming forward with rebuttal evidence sufficient to counter that ground of rejection. Based upon the evidence before the PTO and the additional evidence presented at trial, the district court found that appellant failed to demonstrate that his device was operative or useful.

---

**2.** See, for example, Fed.R.Civ.P. 53(e)(2), relating to a report by a master which the district court must review under the clearly erroneous standard.

**3.** *Id.*

■ Our review of the evidence reveals no basis for reversing the district court findings as clearly erroneous. Although Dr. Lindsay concluded that the taste sensitivity tests demonstrate that "exposure to the magnetic device according to the above-identified application alters the flavor of human-consumable liquids," the evidence relied upon is not so clear. For example, the two-sample taste test results for brandy, coffee, and sweetened orange juice show that in each case 21 out of 30 "correct" responses were obtained. Dr. Lindsay testified on cross-examination that "correct" responses included both the correct identification of two samples that were the same (both treated or both untreated) as well as samples that were different. However, the number of correct responses counted for samples which were the same is undisclosed. Obviously, if all or most of the samples tested were, in fact, the same, the results are meaningless.

Moreover, as noted by both the board and the district court, the testing was done on only a select group of beverages, while the claims encompass a much broader class of liquids.

The Addendum Report, added to the record before the district court, adds little evidentiary support to appellant's case. The Report explains that due to the "subtle flavor modifications," which are "extremely difficult to describe and define," it "has been difficult to convincingly establish [the invention's] efficiency." Such explanation makes even more crucial the need for evidence sufficient to overcome the PTO's *prima facie* case of inoperability.

As to the objective tests, both the district court and the board found the observed physical property changes in liquids subjected to a magnetic field to be *de minimis*. For example, while the data shows that fixed volumes of gin gained a mass of .0057 grams when subjected to a magnetic field, the same volume is shown as undergoing a change of .0380 grams due to a 1°C temperature change. Other data shows that passing coffee through a placebo device had a greater effect on the pH of the coffee than the effect purportedly caused by passing coffee through the magnetic device.

Appellant urges us to accept the testimony of Dr. Lindsay, "a disinterested expert in the field," concluding that both the subjective and objective tests verify the invention's operability. In view of the nature of the claimed invention, however, we find no error in the evaluation of the opinion of a single declarant as insufficient to overcome the PTO's *prima facie* case. Dr. Lindsay's opinion alone simply does not constitute "evidence of the type convincing to the scientific community."

In sum, the evidence in the record does not convince us that the district court clearly erred in finding the invention inoperative. Thus, the rejection under §§ 101 is affirmed.

*Obviousness*

On the question of obviousness, the district court stated:

With respect to whether the invention was obvious, the Court only notes that the Board has carefully considered that matter and resolved it against the plaintiff. Nothing in the record leads to a "thorough conviction" that the Patent Office and the Board were wrong.

602 F.Supp. 484, 224 USPQ at 242.

■ The court's statements appear to treat the entirety of the determination of obviousness improperly as a question of fact, rather than as a conclusion of law which is required by the law of this circuit. *Gardner v. TEC Systems, Inc.*, 725 F.2d 1338, 1344, 220 USPQ 777, 782 (Fed.Cir. 1984) (in banc). However, in view of our upholding the other grounds of rejection, we do not need to address this issue on the merits.

*Conclusion*

The judgment of the district court, dismissing the civil action, is *affirmed*.

AFFIRMED.

PAULINE NEWMAN, Circuit Judge, concurring in part.

I concur in affirming the judgment of the district court. The court reached the correct result on "the facts in the case", as required by 35 U.S.C. § 145, in holding on the evidence as a whole that Mr. Fregeau had not met a reasonable burden of demonstrating operativeness and therefore utility of his claimed invention in terms of 35 U.S.C. § 101.

I do not join the majority's views in the section of its opinion headed *"35 U.S.C. § 145 Proceedings"*. These views are *dicta* in that they apply to no issue raised by the parties or affecting our decision. Nevertheless, the majority takes unnecessary steps toward reducing the differences between § 145 and § 141 actions, thus contravening a hundred years of congressional intent.

Now that the Federal Circuit receives the appeals in both § 145 and § 141 actions, it is incumbent upon us to preserve the intent of Congress in the dual path of review of Patent and Trademark Office rulings. We are responsible for assuring that the legislative purpose is not lost or diminished.

A careful study of this legislative history shows that Congress intended, from the beginning of the patent examination system, to provide substantive judicial review of PTO decisions. The bill in equity that is the ancestor of 35 U.S.C. § 145 arose following the Patent Act of 1836, the act that created a Patent Office and established examination rather than registration of patents. Section 10 of the Patent Act of 1839 amended section 16 of the 1836 Act, which

related to Patent Office decisions on priority, to extend the remedy of a bill in equity "to all cases where patents are refused for any reason whatever".[1] A suit in equity could be filed from an adverse decision of either the Commissioner, or the Chief Justice of the District Court of the District of Columbia who in turn heard appeals from decisions of the Commissioner.

Over the years there were periodic modifications of these review procedures[2], but the fundamental principle was reaffirmed that "a party who is refused a patent by the Commissioner will have at the outset a judicial decision as to his right to it or that he has no right to it".[3] As the Supreme Court said in *Butterworth v. United States ex rel. Hoe*, 112 U.S. 50, 61–62, 5 S.Ct. 25, 31, 28 L.Ed. 656 (1884):

It is thereby provided that the applicant may have remedy by bill in equity. This means a proceeding in a court of the United States having original equity jurisdiction under the patent laws, according to the ordinary course of equity practice and procedure. It is not a technical appeal from the Patent Office ... confined to the case as made in the record of that office, but is prepared and heard upon all competent evidence adduced and upon the whole merits.

In testimony leading to the Patent Act of 1927, then Commissioner of Patents Robertson referred to a Revised Statutes § 4915 suit, the direct predecessor of 35 U.S.C. § 145, as one where an applicant would proceed *"de novo"* in district court, with the right to build a new record with testimony or evidence in addition to that developed before the Patent Office.[4]

---

1. An Act in addition to "An act to promote the progress of the useful arts", ch. 88, § 10, 5 Stat. 353, 354 (1839), reads:

 *And be it further enacted*, That the provisions of the sixteenth section of the before recited act shall extend to all cases where patents are refused for any reason whatever, either by the Commissioner of Patents or by the chief justice of the District of Columbia, upon appeals from the decision of said Commissioner, as well as where the same shall have been refused on account of, or by reason of, interference with a previously existing patent....

2. Section 10 of the 1839 Act was replaced by section 52 of the Patent Act of 1870, ch. 230, 16 Stat. 198, 205. With only minor changes, section 52 of the 1870 Act was codified as Revised Statutes § 4915 in 1874.

3. Cong.Globe, 41st Cong., 2d Sess. 2679, 2682 (1870).

4. *To Amend Section 52 of Judicial Code [Title 35] and Other Statutes Affecting Procedure in Patent Office: Hearings on H.R. 6252 and H.R. 7087 Before the House Committee on Patents*, 69th Cong., 1st Sess. 78–82 (1926).

The Chairman of the House Committee on Patents, Congressman Albert H. Vestal, stated "if a party feels aggrieved, he can bring his suit in the equity court, but it is not an appeal. It is the bringing of a new suit." [5] Elaboration is seen in the testimony of Charles H. Howson, Chairman of the ABA Committee on Patent Law Revision, who referred to the R.S. § 4915 suit as an "independent suit in equity" or an "independent appeal" where one is heard on a "new record".[6] He stated:

The advantage of section 4915 is that it enables the party in interest, desiring to obtain a patent, to take evidence in a court or tribunal whose business it is to try issues of facts and make up a record in addition to that he has been enabled to furnish the examiners in the Patent Office, and therefore get before a court of competent jurisdiction everything connected with his rights and every fact connected with his patent; in other words, have before him everything that courts in the country have before them in infringement cases.[7]

Congressman Underwood explained that if an applicant did not wish to appeal to the Court of Appeals for the District of Columbia (the then-existing route for appeals on the Patent Office record, succeeded in 1929 by appeals to the Court of Customs and Patent Appeals), "[t]hen in that case the object is to have a *de novo* proceeding by a bill in equity under section 4915 for the benefit of the adverse party." [8]

P.J. Federico observed in his definitive article "Evolution of Patent Office Appeals":

The bill in equity is not a technical appeal from a decision of the Patent Office, but is "a suit according to the ordinary course of equity practice and procedure." 22 J.Pat.Off.Soc'y 838, 937 (1940).

This law remains unchanged in its codification in § 145 of the 1952 Patent Act.

The commentary of Charles J. Zinn, counsel to the House Subcommittee on Patents at the time, stated at 1952 U.S.Code Cong. & Ad.News 2507, 2517:

This chapter dealing with the review of Patent Office decisions by the Court of Customs and Patent Appeals and by civil actions in the federal courts consists of six sections (141–146) which restate the existing law with few changes in substance. The authorization for appeal to the Court of Customs and Patent Appeals set out in section 141 is a restatement of the former law with only changes in phraseology.

\* \* \* \* \* \*

In section 145 relating to civil actions to obtain a patent, the law is brought up to date by specifically changing the references to bills in equity which are obsolete. The time for filing the action is made to conform to the time for taking an appeal to the Court of Customs and Patent Appeals....

This history controverts the majority's attempted redefinition of this role. The majority cites *Morgan v. Daniels,* 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894), as authority for the position that "the facts found by the board 'must be accepted as controlling' unless the court has a 'thorough conviction' that the contrary is established". But *Morgan v. Daniels* was limited by that court to contested interferences, "where the question decided in the Patent Office is one between contesting parties as to priority of invention". *Id.* at 125, 14 S.Ct. at 773. It never related to § 145-type actions.

Interference appeals (under 35 U.S.C. § 146 and predecessor statutes) expressly provide for admission of the PTO record "to have the same effect as if originally taken and produced in the suit". There is

---

**5.** *Id.* at 36.

**6.** *Id.* at 20.

**7.** *Id.* at 21.

**8.** *Procedure in the Patent Office: Hearings on H.R. 7563 and H.R. 13487 Before the House Committee on Patents,* 69th Cong., 2d Sess. 14 (1926); *see also id.* at 15 (statement by House Chairman that a R.S. § 4915 applicant "can be heard where it is *de novo.*").

no such provision in § 145, which to the contrary requires the district court to "adjudge ... as the facts in the case may appear". The majority's pronouncement that "the record before the office is the evidentiary nucleus" in § 145 actions thus goes beyond the statute and precedent.

By the Federal Courts Improvement Act of 1982 there was transferred to this court the appellate review of § 145 actions, in addition to the direct appeal under § 141. We must be vigilant to preserve to patent applicants the alternative procedures that the law provides, and to preserve the historical distinction between them. In this we are bound and informed by continuously reaffirmed congressional intent. The majority has eliminated a substantive difference between these paths, by its requirement that the trial court "follow the clearly erroneous standard utilized by appellate courts", and leaves unclear how this standard is affected if additional evidence is introduced.

In addition to authorizing the introduction of new evidence, the § 145 action differs from a Board proceeding in that witnesses may be called to testify before the trial judge. Although the Board may consider affidavit evidence, the Board has no opportunity to observe the demeanor or character of witnesses, or to make the type of credibility or weight determinations that are possible with live testimony, subject to cross-examination and judicial inquiry.

Whether the testimony adduced in district court is cumulative to or augments that before the Board, the trial court should be free to decide the matter on the evidence before it. The "clearly erroneous" standard advocated by the majority at the trial level is inimical to the independent fact-finding role of a trial court. Such a standard requires the trial court not only to hear and weigh the evidence before it, but also to decide how wrong the Board was: a curious assignment, and contrary to the plain intent of Congress to preserve in § 145 actions a different form of review from the appellate review of § 141.

The majority correctly states that a § 145 proceeding "is not simply an appeal". Section 145 never was an appeal in the legal sense: it is carefully recited to be a "remedy by civil action ... as the facts in the case may appear". 35 U.S.C. § 145. The majority's analogy that the district court should review the Board of Appeals' findings as if the Board were a special master appointed by the court, points up the contrast between the majority viewpoint and the basic purpose of the proceeding. No authorizing legislation, from the first enactment to date, has attached a presumption of correctness to decisions of the Patent Office in proceedings under § 145 and its predecessor statutes. Such intent is contrary to the congressional purpose.