Joseph W. **NEWMAN**, Plaintiff,

v.

Donald J. **QUIGG**, Commissioner of Patents and Trademarks, Defendant.

Civ. A. No. 83–0001.

United States District Court, District of Columbia.

Feb. 17, 1988.

As Amended Feb. 26, 1988.

John P. Flannery, II, Leesburg, Va., for plaintiff.

Fred E. McKelvey, Office of the Solicitor, Arlington, Va., for defendant.

### DECISION AND ORDER

JACKSON, District Judge.

Plaintiff Joseph W. Newman, of Lucedale, Mississippi, an inventor, sues Donald J. Quigg, U.S. Commissioner of Patents and Trademarks, in his official capacity as head of the U.S. Patent and Trademark Office ("Patent Office" or "PTO") pursuant to 35 U.S.C. § 145. Newman is an "applicant dissatisfied" with the decision of the Board of Appeals affirming an examiner's rejection in Newman's application for a patent for an invention he entitles: "Energy Generation System Having Higher Energy Output Than Input."[1] Upon the following facts, as found by the Court in accordance with Fed.R.Civ.P. 52(a), upon trial without a jury, the Court concludes, for the reasons stated, that judgment must be given for defendant and the complaint dismissed with prejudice.

### I.

On August 18, 1980, Newman filed the instant application with the PTO for a U.S. patent for his invention. In the "abstract" section of his application he describes it, in pertinent part, as:

A system for generating obvious work motion, or electromagnetic energy (fields of force) or electric current, utilizing the electromagnetic energy which makes up all matter and results in a greater output of energy, than the initial input of conventional energy means and teachings. This is accomplished by arranging one or

a variety of mechanical situations, whereby matter is converted into usable and controllable electrical or magnetic energy in an extremely efficient manner which mechanically achieves the degree of energy releaseable from matter in accordance with Einstein's equation of $E = MC^2$. [sic]

The system utilizes the gyroscopic actions of the electromagnetic field particles in which the structural elements of the generator place a force at an angle to the gyroscopic particles causing the particles to follow paths having a net directional effect, producing electric current flow.

*Copy of the Contents of U.S. Patent Application, Serial No. 179,474, filed August 18, 1980, by Joseph Westley Newman* (hereinafter "Joint Exhibit") Vol. I., p. 7.

In his discussion of the "prior art" he observes that all other systems for the production of electrical energy (e.g. mechanical friction, thermo-electricity, photoelectricity, piezoelectricity, electrochemistry, and electromagnetic induction)

are designed accordingly [sic] to rigid mathematical laws taught both in physics and electrical engineering which coincide with the hypothesis rigidly accepted by the industrial and scientific communities concerning the Second Law of Thermodynamics (1850) ... [viz.], that the electric current flowing in a closed circuit from a battery, electric generator, etc., is used up in the mechanical device being operated ...; that all such ... systems would only put out at most work equal to the work initially put into the system ... [and] that a particular electrical generating system was only capable of a given output of energy and no more.

*Id.* at 9–10.

"The prior art," he asserts, "has failed to understand certain physical aspects of matter and the makeup of electromagnetic fields, which failure is corrected by the present invention." His many years of re-

---

1. The original title—"Electrical Energy Generating System Utilizing the Gyroscopic Actions of Electromagnetic Field Particles"—was changed by Newman by an amendment of his patent application a year after filing it.

search, consideration, evaluation and inventing have revealed to him certain "principles or guidelines," namely, that "all matter is made up of electromagnetic energy; ... that electromagnetic energy comprises quanta or particles of energy moving at the speed of light and having spin characteristics ... [and] that these electromagnetic energy quanta behave in accordance with the normal laws of mechanics and, in particular, in accordance with the principles of gyroscopic action." Utilizing these principles, he says, his invention will produce "more efficient" electrical motors and generators from "materials and designs heretofore considered ... impractical, if not impossible." *Id.* at 11–12.

Newman then describes the six drawings representing various "embodiments" of his invention (Figs. 1–6 to his application)[2] and continues with an explanation of "related principles" he has discovered: contrary to contemporary teaching that the magnetic field associated with an electric current-carrying conductor results from the electric current itself,

> the gyroscopic particles making up the electric current ... interact with the electromagnetic makeup of the atoms of the conductor, causing them to align extremely rapidly, thereby then releasing some of their electromagnetic make-up in the form of a magnetic field....

> *     *     *     *     *     *

> The magnetic field is the result of the atom alignment of the conductor. The more atoms in a conductor (up to a point), the stronger the magnetic field produced from a given amount of electric current input.... The reasons for this is that there are more conducting atoms to interact with the gyroscopic particles of the electric current moving through the conductor, which results in a greater number of conducting atoms being

aligned, thereby then releasing some of their electromagnetic make-up....

*Id.* at 22–24.

On August 24, 1981, and again on January 6, 1982, the first patent examiner rejected Newman's application under 35 U.S.C. § 112, first paragraph.[3] Newman appealed to the Board of Appeals, comprised of three examiners-in-chief, who unanimously affirmed the first examiner's rejection on November 5, 1982. The Board said:

> We do not doubt that a worker in this art with appellant's specification before him could construct a motor ... as shown in Fig. 6 of the drawing. Such a motor would not and could not be made to operate at an efficiency level of greater than 100%.... Such a machine is impossible. If it were possible ... some of the output energy developed could be fed back into the input and the machine would work forever without any external source of energy. Such machines are known as perpetual motion machines.... [M]achines of this type will not work. They violate either the first or the second law of thermodynamics.

> *     *     *     *     *     *

> When a patent applicant presents an application describing an invention that contradicts known scientific principles the burden is on the examiner simply to point out this fact to appellant.... [T]he burden shifts to appellant to demonstrate either that his invention, as claimed, does not violate basic scientific principles or that those basic scientific principles are incorrect. In this case, appellant has attempted to do the first[;] he has invoked the mass-energy equivalence doctrine of Albert Einstein.

> *     *     *     *     *     *

> There have been limited applications of the doctrine of mass energy equivalence. The scientific community has managed to obtain what is commonly known as atom-

2. Figs. 5 and 6 illustrate, he says, "rough working prototypes" of his invention. Joint Exhibit, Vol. I, p. 50. (Appendix 1 hereto).

3. 35 U.S.C. § 112, first paragraph, requires that the "written description of the invention, and

the manner and process of making and using it [shall be] in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same...."

ic power.... The relationship between ... atom splitting technique and appellant's invention is unclear from the description.

\* \* \* \* \* \*

[Certain of appellant's claims] embrace within their confines ... appellant's theory that he is somehow converting mass into energy in accordance with Einstein's equation $E = mC^2$. There is *no evidence* before us that appellant has done that[,] nor is there any disclosure which would enable anyone having ordinary skill in the art to do it. (Emphasis in original).

\* \* \* \* \* \*

The only independent claim before us which does not directly embrace appellant's theory ... has the basic infirmity that it recites that appellant obtains more energy out of his apparatus than he puts in. This is impossible unless some of the mass of the device is converted to energy in accordance with appellant's theory. Therefore, appellant's theory is also claimed by implication. No evidence before us of any nature or description establishes that appellant's apparatus achieves a mass-energy conversion.

Joint Exhibit, Vol. IV, pp. 715–18.

Newman's complaint in this Court was filed January 3, 1983, and prayed for trial *de novo*, reversal of the "judgment" of the Board of Appeals, and an order directing the Commissioner to issue letters patent to him. Newman alleged that he was "the original and first inventor" of an energy generation system having higher energy output than input, a result he achieved "by producing an internal conversion of matter into energy in a way heretofore never achieved." Defendant answered with a general denial, and asserted that the examiners had correctly rejected plaintiff's application on the ground of 35 U.S.C. § 112, first paragraph.

After a protracted, and acrimonious, period of pretrial motions, appeals, and discovery disputes lasting until late 1986, The case came on for trial on December 6, 1986.[4]

### II.

Newman called three witnesses in support of his claim that a patent should issue: a physicist (with a doctoral degree), presently the manager of a superconductive electronics technical center for Unisys Corporation in St. Paul, Minnesota; a mechanical engineer (with a bachelor's degree) now working for the State of Mississippi's Bureau of Geology; and a maintenance engineer (*sans* degree) for a New Orleans television station.[5] All three, originally skeptics, are now converts to Newman's faith in his device as a truly revolutionary mechanism. The latter two have invested with him. They have each observed a "Newman device" in operation on several occasions, speak knowledgeably about what they observed (and in some cases measured) on those occasions, and are not inherently incredible. The "Newman device" of which they testify has been given several incarnations, but each resembles an unremarkable conventional electrically powered motor/generator in most particulars, differing

---

**4.** Cross-motions for summary judgment were referred by the Court to a special master, pursuant to Fed.R.Civ.P. 53, whose report of September, 1984, although rejected in part by the Court, prompted a remand to the PTO for reconsideration of the application by a new examiner. On November 30, 1984, the second examiner preliminarily rejected the application on the same ground as his predecessor, but ordered Newman to submit working models of his "embodiments" of his device to the National Bureau of Standards ("NBS") for testing by May 30, 1985, pursuant to 35 U.S.C. § 114. Newman declined to do so, whereupon the PTO took the position that the application had been abandoned.

On October 2, 1985, however, the Court ordered Newman to produce "one (1) working model of each device" for which he was seeking patent protection to NBS for testing pursuant to Fed.R.Civ.P. 34. After his appeal of that order was denied, Newman did produce one prototype of his machine to NBS which completed its tests in June, 1986. (Defendant's Exhibit 4, Appendix 2 hereto).

The PTO added lack of utility, 35 U.S.C. § 101, as an additional ground of defense at Pretrial Conference on December 4, 1986.

**5.** Newman himself did not testify; he did not even attend the trial. Nor was a "Newman device" ever present in, or demonstrated to, the Court.

primarily only in the extraordinary length of its copper wire coil. It is in the powers Newman's witnesses ascribe to the device that it becomes remarkable indeed.

A Newman device, it appears, consists of a rotary (or reciprocating) magnet (weighing, depending upon the model, from 90 to 500 pounds), situated either within or without an air-cored copper wire coil (comprised of No. 5 and No. 14 gauge wire, weighing from 500 to 9200 pounds, and, by one report as to one model, up to 55 miles in length). Attached to the magnet is a plastic commutator, with a periphery, i.e., its circumferential edge, at intervals conductive and non-conductive, which, as it rotates, makes contact with brushes connected to the coil terminals. The power source, connected to electrical contacts on the commutator, is the direct current provided by a battery pack of multiple alkaline (viz., nonrechargeable dry cell) batteries arranged in series.[6]

Only Dr. Roger Hastings, the physicist, was asked directly to define a Newman device's "input" and "output" for purposes of ascertaining whether the latter exceeds the former. The "input," he said, consisted of the power supplied by the batteries. The "output," however, should be deemed to include not only mechanical work done (when configured as a motor) or the current generated in an adjoining coil (as a generator)—conventionally considered to be any motor/generator's "useful" output —but also certain other "outputs," e.g., the current-generated heat emanating from the coil, or the friction heat developed in the bearings upon which the magnet/commutator rotates. By far the most significant increment to "output" in a Newman device, however, according to Dr. Hastings, is to be found in certain anomalous "back spikes" of current it generates in the me-gaHerz range, which Dr. Hastings asserts he has perceived on an oscilloscope, listened to on (and used to power) a transistor radio, and observed to heat a beaker of water when channeled through a resistor immersed in it.

Dr. Hastings advanced no explanation for the presence of the "back spike" current. He hypothesized that it originates in the coil, although the configuration of the commutator could affect it. These "back spikes" can be detected in the circuit between the battery pack and the commutator, he said, and they may somehow be responsible for the phenomenon all three of plaintiff's witnesses said they had observed on several occasions: a virtually indefinite extension of the work life (in effect, a "recharging") of ostensibly non-rechargeable batteries used to power a Newman motor which would, while in operation, perform work at least equal to that performed by commercially available electric motors, using (when measured by ammeter) a minuscule fraction of the current they had drawn in doing so.[7]

The accounts given by plaintiff's witnesses are anecdotal, and largely qualitative rather than quantified by measured data. But they all relate instances in which they personally watched while new (and used) batteries exhausted themselves in brief spans while powering conventional motors (with and without loads), and were then apparently rejuvenated upon connection to a Newman motor, so much so that the Newman motor would operate for hours without a sign of battery depletion (or at least for a much longer period than its conventional counterpart had worked). Then, when reconnected to the conventional motor on which they had originally been expended, the batteries appeared to have been restored to a point at which they

---

**6.** Plaintiff's witnesses testified that the device "destroys" "power packs" (transformers of household AC current to DC), and "scratches away" the active material on the plates of rechargeable (wet cell) batteries, rendering them nonrechargeable. The explanation for these effects *may* be the "back spikes" it produces, *see infra.*

**7.** Newman's patent application makes no express mention to the device's emission of "back spikes" of radio-frequency current, nor does it expressly claim a battery-recharging capability for it. Two brief mentions of a current which "get[s] back into the battery" attribute a destructive effect to it. *See* Joint Exhibit, Vol. I, pp. 33–34. "Back spikes" and extended battery life were, thus, first postulated as being related by Dr. Hastings' testimony at trial.

could drive it once more, on two occasions for periods longer than it had taken to exhaust them initially.

### III.

Defendant's case consisted almost entirely of the NBS team leader's presentation of the circumstances and the results of the Bureau's tests on the Newman device. *See* n. 4, *supra.*[8] Dr. Robert Hebner, the supervisory physicist in charge of NBS' applied electrical measurements group assigned to conduct the tests, testified that a Newman device (unaccompanied by a power source) arrived at the NBS laboratory in Gaithersburg, Maryland, on January 24, 1986, shortly after the U.S. Court of Appeals for the Federal Circuit had denied Newman's petition for a writ of mandamus to prohibit the tests. It was accompanied by a letter (Defendant's Exhibit 7) from Newman's attorney—not Newman himself —giving detailed instructions on how to unpack it, cautioning against rotating the magnet in the wrong direction or using excessive voltage to power it, and declaring it to be Newman's intent to have all NBS' testing observed by his representatives. The letter said nothing, however, about operation of the device.

Upon uncrating the device Dr. Hebner noted several conditions about it which appeared to him to be shipping damage, and he accordingly wrote the attorney to inform him of it. He also requested operating instructions for the device, including, specifically, the locus of energy output. The attorney's reply, for the most part, simply accused NBS of compromising the "security" of the device and delaying the testing. It acknowledged the shipping damage but dismissed it as inconsequential. And in response to Dr. Hebner's request for operating instructions, the letter insolently referred him to a four-page excerpt from Newman's self-published book, "The Energy Machine of Joseph Newman." The first page of the excerpt was a photograph of a Newman device superficially similar to the device delivered to NBS. The final three pages were a reprint of an affidavit of Dr. Roger Hastings, dated June, 1984, the only pertinent portion of which was a paragraph headed "Useful Output" which read, in its entirety:

> Mr. Newman placed a 75 Watt, eight foot, flourescent [sic] tube across the motor coil, and the bulb lit to perhaps 10% of full brightness. Interestingly, when the bulb was inserted, the rotary gained speed, and the motor drew less current from the batteries! The lit 75 watt tube demonstrates useful output of several watts, with a fractional watt input power.

(Defendant's Exhibit 10, attachment, p. 4). Dr. Hebner thus concluded that energy output was to be measured "across the coil," and he has never been advised by Newman or anyone else to the contrary.

Dr. Hebner's superiors at NBS, however, refused to allow him to begin the tests until Newman himself put his machine in working order. Newman, his attorney, and other companions, therefore, came to NBS' laboratory on February 10, 1986, bringing a pack of 116 9-volt batteries to serve as the power source. Without commentary Newman personally made various adjustments to the device, connecting the battery pack, and reattaching a brush apparently dislodged in shipping. Next he grounded the device to a wall outlet. Finally he "turned it on" by manually rotating the magnet. Dr. Hebner then asked Newman directly where he intended that the power output be measured. His attorney advised Newman not to answer, and Newman and his coterie departed without further comment.

A few weeks later Dr. Hebner and his colleagues published their proposed test protocol under date of March 20, 1986. (Defendant's Exhibit 16). It described the device delivered to NBS as an electrical "generator," since it was not equipped with a mechanical takeoff, and stated clearly

---

**8.** PTO concluded its evidence with testimony defining the first and second laws of thermodynamics by which it claims the Newman device is (as are all machines) constrained: the difference between the energy introduced into a system and its useful work output is accounted for internally, and there are always losses in the conversion of energy to work.

that its output power would be measured by resistors connected to the terminals of the coil. *Id.* at 3. The test schematic also clearly disclosed that the device, both freestanding and as it would be connected to the electrical diagnostic equipment, was attached to ground. *Id.* at 5. Newman made no objection to the test protocol, and offered no criticism, advice or instruction. He complained only in court, through his attorney, and then only as to the length of time NBS was taking to complete the testing.

NBS' final report (Defendant's Exhibit 3) was filed with the Court on June 26, 1986. Its conclusion was unequivocal:

"At all conditions tested, the input power exceeded the output power. That is, the device did not deliver more energy than it used."

*Id.* at i. Over the preceding three months Dr. Hebner and his colleagues had measured power input from the battery pack (configured to supply either 800 or 1000 volts) using a sampling watt meter and an analog multiplier watt meter. They measured power output across resistive loads, ranging between 50,000 and 400,000 ohms connected in parallel with the coil, with a differential active attenuator and a thermal voltage convertor. Measurements were made simultaneously with two instruments as a cross-check, and input and output measuring equipment was switched for further verification. In the 77 measurements they recorded (both uncorrected, and corrected for instrumentation-induced errors) they found internal power losses between input and output of between 2.2 watts and 4.9 watts, and calculated the efficiency of the device at between 27 per cent and 77 per cent. No measurement made reflected, at any setting, a power gain, or an efficiency greater than 100 per cent.[9]

The NBS investigators, too, detected, but made no attempt to measure, the radio-frequency power "spikes" Dr. Hastings

thought might be so significant. They attributed them to the sparks emitted by the commutator as it rotated through a cycle (causing deterioration of the non-conductive spacers on its periphery), regarded them as artifacts which interfered with accurate measurements of power input, and filtered them out with a low-pass filter on the input side of the device. Consequently, they made no attempt to ascertain their effect, if any, upon the batteries. Nor did they make any measurements of battery life.[10] They were given no reason to do so.

Newman presented no rebuttal. The cross-examination of Dr. Hebner sought only to point out that Newman's own wiring diagrams show no grounds or filters, and that by grounding the device and endeavoring to eliminate all RF "noise," NBS omitted from its calculus of "output" the most significant of its byproducts, namely, the electromagnetic energy by which it may possibly be rejuvenating its power supply.

## IV.

A decision of the PTO Board of Patent Appeals, whether reviewed by way of a direct appeal to the U.S. Court of Appeals for the Federal Circuit under 35 U.S.C. § 141 or a civil action to set it aside before the U.S. District Court for the District of Columbia pursuant to 35 U.S.C. § 145, is presumptively correct. *Fregeau v. Mossinghoff,* 776 F.2d 1034 (Fed.Cir. 1985). It may be overturned only if "clearly erroneous," by which is meant that the reviewing court must be of the " 'definite and firm conviction' that a mistake has been made." *Id.* at 1038 (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). Review by the court of appeals is confined to the PTO record and the Board's decision. When new evidence is presented in a *"de novo"* proceed-

---

9. NBS ran its tests weekdays, 8:30 a.m. to 5:00 p.m., between March and June, 1986. Despite having insisted on having his own observers present at all tests, neither Newman, his attorney, nor any representative attended any of them. PTO observers were present twice.

10. NBS did determine that the low-pass filter reduced measured power input by three per cent, thus causing the device's efficiency to be overstated when it was in use. *See* Defendant's Exhibit 3, p. 21.

in a civil action in district court, the record before the PTO is nevertheless the "evidentiary nucleus," *id.* at 1037, which the court must consider in conjunction with the evidence adduced at trial in making its independent findings of fact. *Id.* at 1038. This Court, having made such a consideration, concludes, as did the Board, that Newman's device lacks utility (in that it does not operate to produce what he claims it does), and the Board's decision is not clearly erroneous. Hence, it must conclude that Newman's patent application was properly rejected under 35 U.S.C. § 101.

The Court finds, further, as did the two examiners, that the application should likewise fail for insufficient disclosure under 35 U.S.C. § 112, first paragraph. Plaintiff's Claims Nos. 38 and 43—the only claims the PTO believes to be properly before this Court—are representative.[11] Claim No. 38 asserts that the device

... increases the availability of useable electrical energy or useable motion, or both, from a given mass or masses by a device causing a controlled release of, or reaction to, the gyroscopic type energy particles making up or coming from the atoms of the mass or masses, which in turn, by any properly designed system, causes an energy output greater than the energy input.

Claim No. 43 describes a

... method of producing useable energy, comprising the following steps:
a. imputing [inputting?] energy into a device from an external source;
b. having electric[a]l current flow within said device; and
c. utilizing the internal electromagnetic energy of at least some of the matter in the device to add to the energy being inputed [sic] into the device from the external source to produce useful energy for use outside of the device having an amount greater than the energy being inputed [sic] to the device.

Aside from Newman's own somewhat metaphysical writings which appear at multiple points throughout his patent application, there is no evidence whatsoever, in the PTO record or the trial record, from which to find the existence of such "gyroscopic particles," their observable (or measurable) "release" or "reaction" within the device, or any manifestation of their enhancement, in a recoverable form, of its "energy output" as that term is customarily used. Similarly, there is no evidence of an extraction of "internal electromagnetic energy" from the "matter" of the device. At best, for plaintiff's purposes, the evidence supports a finding that Newman's device will operate, for reasons not explained at all but must be merely guessed at, on dry cell batteries for longer periods of time than others which may or may not be comparable. But such a device is not the one for which Newman seeks a patent. He is unequivocal in his insistence that the device he has tendered as patentworthy produces more useable energy output than the energy required to power it. The Court finds the evidence of it insufficient.

The Court credits in full the meticulously thorough and well-documented testing done by NBS, and finds that it measured accurately what it set out to measure, and that it had no reason to measure anything else. It regards plaintiff's efforts to discredit the NBS tests after the fact as specious. Newman has always been unwilling, and has resisted every effort, to subject a working model of his device to third-party testing which might convince either the PTO or the Court. He refused the patent examiner's call for a working model, opposed the PTO's request for Fed.R.Civ.P. 34 discovery in court, and appealed the Court's order that the tests be done. He successfully confounded NBS' request to be allowed to disassemble the device, if necessary, to comprehend its operation. He at-

11. The PTO has moved to dismiss as to all other claims, on the ground that plaintiff's claims have been subject to so many amendments, deletions, substitutions, and additions that only Claims 38 and 43 remain unaltered of those before the Board at the time of its decision, and it is only those upon which the Board has had occasion to pass that this Court has jurisdiction to review.

In view of its disposition of the entire case the Court finds it unnecessary to decide the motion to dismiss.

tempted to retrieve the device from NBS' possession when he concluded the tests were behind schedule. And he declined to cooperate with NBS' team leader in identifying the point (or points) at which he intended "energy output" to be ascertained —the most critical measurement for his purposes—cooperation which would have been eagerly extended had Newman then a genuine desire to establish the veracity of his claims. He made no protest of the test protocol shown to him in advance of the tests. And, having insisted upon, and secured, the right to be present (with expert assistance, if he needed) throughout the tests, Newman ignored the tests altogether, never attending any of them in person or by proxy in the course of three months.

The Court infers from such circumstances that Newman knew in advance that the test results would be adverse, and, thus, finds his *ex post facto* disparagements of them to be no more than rationalizations intended to diminish their evidentiary impact at trial. The Court rejects the implication that NBS was partisan, or somehow biased in favor of the PTO. The record reflects that NBS had from the first been reluctant to commit itself to do the testing, acceding only when personally importuned by the Commissioner after the Court had ordered the tests. It had no interest in the controversy, no purpose of its own to be served in devoting the time and resources the tests would require, and no motive to test in any manner except in accordance with its own high standards. To the extent it may initially have been dubious of Newman's claims, the Court finds it to have been an altogether appropriate scientific skepticism in light of their rather startling character.

For the foregoing reasons, therefore, it is, this 17th day of February, 1988,

ORDERED, that judgment is given for defendant, and the complaint is dismissed with prejudice.

FIG 5

FIG 6

PRINT OF DRAWING
AS ORIGINALLY FILED

APPENDIX 2

Defendant's Trial Exhibit 4
Newman v. Quigg 83-0001 (D.D.C.)

## MEMORANDUM AND ORDER

Upon consideration of defendant's "Motion Under Rule 59" and the Court's re-examination of the trial record, the motion will be granted, and the Decision and Order of February 17, 1988, amended in the particulars noted, but the amendation will be

made pursuant to Fed.R.Civ.P. 60(a) rather than Rule 59.

The Court agrees that it erred in believing that Newman had likewise appealed the second examiner's decision to the Board. It concurs in the observation that its reference to a "thermal voltage invertor" is incorrect, being attributable to a typographical error in the transcript (Page 437, line 5), and that the correct term is a "thermal voltage converter." And it stands corrected as well as to the use of a low pass filter's being limited to the input side, its error having been induced by its misinterpretation of Figure 4, page 7, of Defendant's Exhibit 3, but revealed to be error by its re-reading of pages 6–11 thereof and of the testimony of Dr. Hebner, pages 443–49.

Accordingly, it is, this 26th day of February, 1988,

ORDERED, that the Decision and Order of February 17, 1988, is amended as prayed.